JOHN A. McGREGOR, as Administrator of the Estate of Christ Hanson, Deceased, Appellant, v. GREAT NORTHERN RAILWAY COMPANY, a Corporation, Respondent.

(4 A.L.R. 1635, 172 N. W. 841.)

In an action by an administrator, brought under the Federal Employers' Liability Act to recover damages occasioned by the death of the plaintiff's intestate through alleged negligence of the defendant railway company, where the cause of action arose and the action was begun subsequent to the assumption of Federal control and before the passage of the Rail Control Act of March 21, 1918, it is *held:*

Railroads — Federal Employers' Liability Act — when cause of action arises.
1. Under the Act of Congress of August 29, 1916, authorizing the assumption, in time of war, of control by the President of systems of transportation, and under the proclamation of the President issued in pursuance thereof, prima facie a cause of action for the alleged negligence arose and became vested in the plaintiff prior to the passage of the Rail Control Act.

Effect of Federal control.
2. General order No. 50, promulgated by the Director General of Railroads, which requires that suits upon causes of action arising subsequent to December 31, 1917, shall be brought against the Director General of Railroads, and not otherwise, and which authorizes the substitution of the Director General for the carrier company as party defendant and the dismissal of the action as to the company, is not warranted by the Rail Control Act of March 21, 1918, in so far as it purports to be applicable to causes of action already vested.

**Effect of Federal control.**

3. Section 10 of the Rail Control Act is construed and *held* to authorize the bringing of actions against the carrier corporations during the period of Federal control.

**Effect of Federal control.**

4. Under the Rail Control Act, the Director General is charged with administering the transportation systems owned by the various carrier corporations, but he is not authorized to appear and defend suits brought against them.

**Effect of Federal control.**

5. The carrier corporations, during the period of Federal control, remains legal entities, capable of suing and being sued in the courts, and are champions of their own legal rights.

**Effect of Federal control.**

6. The liability or nonliability of a carrier corporation for acts of alleged negligence occurring during the period of Federal control, is not an administrative question to be decided by the Director General, but is a judicial question to be determined by the courts.

**Effect of Federal control.**

7. The question as to whether or not a carrier corporation may be liable for the negligence of an employee during the period of Federal control is not decided.

Opinion filed April 30, 1919.

Appeal from District Court of Ward County, *Leighton,* J.

Order reversed.

*E. R. Sinkler* and *M. O. Eide,* for appellant.

"Interpleader or intervention will not serve to dismiss the original defendant." Comp. Laws, § 7413.

Order No. 50 by McAdoo is absolutely void. The power to determine what shall be the law cannot be conferred. State v. Young, 29 Minn. 474; State v. R. Co. 38 Minn. 281; Re Wilson, 32 Minn. 145; United States v. United Verde Copper Co. 196 U. S. 297; Thorton v. Territory, 17 Pac. 896; United States v. Grimaud, 220 U. S. 506.

*Murphy & Toner* and *Bradford & Nash,* for respondent.

"Congress had the power to delegate the rights to the President or his representatives to issue order No. 50 (taking over the railroad systems)." United States v. Grimaud, 220 U. S. 506; Shallenberger v. Pennsylvania, 171 U. S. 1.

"McAdoo, as representative of the President, must aid in enforcing the act of Congress taking over the railroads." Ex parte Young, 209 U. S. 123; Greene v. Louisville & Interurban R. Co. 244 U. S. 506; United States v. Lee, 106 U. S. 196; Tindal v. Wesley, 167 U. S. 205.

BIRDZELL, J. This action is brought by an administrator to recover damages occasioned by the alleged negligence of the defendant in causing the death of one Christ Hanson, an employee. The Federal Employers' Liability Act (chap. 149, 35 Stat. at L. 65, Comp. Stat. § 8657, 8 Fed. Stat. Anno. 2d ed. p. 1208) and amendments are relied upon. The injury resulting in the death of the plaintiff's intestate is alleged to have been inflicted on January 22, 1918. In December, 1918, the district court of Ward county, upon motion of the defendant's attorneys, entered an order substituting Wm. G. McAdoo, Director General of Railroads of the United States, as defendant in the place and stead of the Great Northern Railway Company, and dismissed the action as to the latter. This appeal is from the order of substitution and dismissal:

Accompanying the notice of motion was an affidavit by one of the defendant's attorneys stating in substance that the railway company was under Federal control and was in every way subject to the jurisdiction, management, and possession of the government of the United States, acting through the Director General of Railroads, which control commenced on the 1st day of January, 1918, prior to the accrual of the alleged cause of action; and that on or about November 1, 1918, Wm. G. McAdoo, as Director General of Railroads, promulgated general order No. 50, ordering that all actions subsequently brought based upon certain claims, including claims for death, should be "brought against Wm. G. McAdoo, Director General of Railroads, and not otherwise;" and further that, as to actions pending upon causes arising subsequent to December 31, 1917, based upon the operation of any railroad, the pleadings "may on application be amended by substituting the Director General of Railroads for the carrier company as party defendant, and dismissing the company therefrom." The order of substitution purports to have been made in conformity with the requirements of general order No. 50, and the only question

presented upon this appeal is the legal sufficiency of the order to support the action of the district court.

The President assumed control of the railroads, acting under the authority of an Act of Congress of August 29, 1916, as follows: "The President, in time of war, is empowered, through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable." [39 Stat. at L. 645, chap. 418, Comp. Stat. § 1974a, 9 Fed. Stat. Anno. 2d ed. p. 1095.]

The cause of action in question arose after the government had assumed control, and the summons was served on the railway company on March 22, 1918. On March 21, 1918, the so-called "Rail Control Act" was approved, and the authority for the order relied upon to support the substitution is contained in § 10 thereof. That portion of § 10 which is germane to the present inquiry is: "That carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or Federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such Federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal government. Nor shall any such carrier be entitled to have transferred to a Federal court any action heretofore or hereafter instituted by or against it, which action was not so transferable prior to the Federal control of such carriers; and any action which has heretofore been so transferred because of such Federal control or of any act of Congress or official order or proclamation relating thereto shall upon motion of either party be transferred to the court in which it was originally instituted. But no process, mesne or final, shall be levied against any property under such Federal control." [40 Stat.

at L. 456, chap. 25, Comp. Stat. § 3115¾j, Fed. Stat. Anno. Supp. 1918, p. 762.]

The preamble to general order No. 50, after referring to the portion of the statute above quoted, recites: "Whereas, since the Director General assumed control of said systems of transportation, suits are being brought and judgments and decrees rendered against carrier corporations on matters based on causes of action arising during Federal control for which the said carrier corporations are not responsible, and it is right and proper that the actions, suits, and proceedings hereinafter referred to, based on causes of action arising during or out of Federal control, should be brought directly against said Director General of Railroads, and not against said corporations:

"It is therefore ordered," etc. (as hereinabove indicated).

Other provisions of the Federal Control Act make the operating revenues of the carriers the property of the government, and authorize contracts to be entered into between the government and the companies covering the details of compensation as well as matters relating to additions, extensions, betterments, equipment, etc. The measure of control assumed under the original Act of 1916 and recognized by the later Act of March 21, 1918, is so complete as to suggest that claims for damages might be more properly litigated as claims against the railroad administration than against the carrier corporations. Whether or not Congress has authorized this procedure, however, must be determined by the various statutory expressions concerning Federal control. If we felt at liberty to go beyond the acts of Congress, and to determine the rights of individuals and the public arising out of their relations with the carriers, it might be possible to justify such an order as the one in question as being an exercise of a war power inherent in the Executive as commander in chief of the armies. But Congress has spoken upon this subject, and we are not inclined to go beyond the legislative authority to seek justification for the order in question. It is peculiarly appropriate here to confine our investigation to the acts of Congress, not only for the reason that Congress has dealt so fully with the subject, but for the further reason that a possible liability of the government is involved, and before there could be such a liability Congress must be found to have assented.

At the time of the injury upon which this action is predicated,

control had been assumed by the President under an act which did not purport to limit in any degree the rights of the public in their relations with the carriers, except to the extent necessary to permit the full use of the transportation facilities to serve the military needs of the government. The statute was very brief and apparently was designed to authorize control for military purposes and related emergencies. Under the President's proclamation of December 26, 1917, it was expressly provided that "suits may be brought by and against said carriers and judgments rendered as hitherto, until and except so far as said Director may, by general or special orders, otherwise determine."

Such was the status of Federal control at the time the alleged cause of action arose, and it was the same at the time of the passage of the Federal Control Act in March, 1918.

It may be true, as suggested by District Judge Evans, in the case of Muir v. Louisville & N. R. Co. 247 Fed. 888–895, that this proclamation of the President has not the force and effect of law, but nevertheless it reflects the measure of control that had been assumed prior to the time of the injury alleged as the basis for the action at bar. There can be little doubt that the defendant railroad company was prima facie liable to respond in damages in causes similar to that alleged at the time the cause of action arose.

Our inquiry, then, resolves to this: Assuming that a right of action had vested in the plaintiff prior to the Act of March 21, 1918, and prior to the issuance of the order in question, does general order No. 50 operate to deprive the plaintiff of the right to maintain his cause of action; and, if so, is the order justified as an exercise of war powers under the Act of March 21, 1918?

It can scarcely be doubted that the order is intended to relieve the carrier corporations from responsibility. The preamble to the order shows that it is prompted by the notion that carriers should not be held responsible for causes arising during Federal control, and the order purports to authorize both the dismissal of the action against the carrier and the substitution of the Director General. In our opinion it cannot be successfully contended that a judgment against the substituted defendant would be binding upon the carrier corporation. The only theory upon which it could be so held is that the corporations

themselves, rather than the transportation facilities owned by them, are under Federal control, and that the Director General acts as their agent. There is clearly no room for such a construction of any act of Congress bearing upon this question. The legislation contemplates that the carrier corporations shall be permitted to continue to transact their business as formerly, except as modified by the Federal control of their transportation facilities. They may sue and be sued as formerly, and judgments obtained give rise to the same remedies for enforcement, except that their transportation facilities are not subject to levy or seizure.

In the case of United States R. Administration v. Burch, 254 Fed. 140, it was held that the railroad administration could not enjoin a sheriff from selling real property belonging to a railroad company for the satisfaction of a judgment. The property in question was held not to be a part of the system of transportation, and it was said to be a judicial question whether the control of such property could be assumed by the Director General, the court holding that it could not. In Dooley v. Pennsylvania R. Co. 250 Fed. 142, it was held, however, that traffic balances which go to make up the working or liquid capital of a railroad company are not subject to garnishment during Federal control, because "the tying up of such a fund would clearly be detrimental to the successful operation of a railroad system. . . ."

We are fully convinced that, notwithstanding Federal control of the transportation facilities, the carrier corporations are still capable of representing their own interests in litigation, which may result in judgments being obtained against them. And, since they are not under the jurisdiction of the Director General in this matter, we can see no reason why the carrier corporations should be bound by any judgment rendered in a suit in which they are denied the right to appear and defend.

It is possible that as a result of the government control of the transportation facilities the carriers are so far denied the right to direct and manage their own affairs in connection with transportation that they cannot be held liable for the negligence of an employee. If such be the case, however,—and upon this question we express no opinion,— this would merely constitute a defense to an action brought against

the carrier, and such an order as the one in question would not be needed to protect the legal rights of the corporations. Whether or not the carrier corporations are responsible for the acts of various employees and agents is a judicial question to be decided in the ordinary course of judicial proceedings, looking toward reparation in actions predicated upon alleged violations of rights, and it is not an administrative question to be decided out of hand by the Director General. It is clear to us that the carrier corporations continue as legal entities, capable of defending any suits brought against them, and that the Director General has not been authorized to assume control of their affairs to the extent of becoming the champion of their legal rights in the courts. It is therefore for them to determine upon what grounds they will contest a liability sought to be fastened upon them.

We are also satisfied that a judgment rendered in a suit in which the only defendant is the Director General would not bind either the Federal government or the Director General personally. It is clear from the order that the Director General purports to act for the government alone, and from this it follows, of course, that he is substituted as a defendant in a representative capacity. That the judgment would not bind him, therefore, is elementary. Before the judgment could bind the government it must appear that Congress has consented to the maintenance of such suits against the government. It has not so consented; but, to the contrary, it has said that suits may be brought against the carriers. This negatives an intention that they may be maintained against the government. It does not follow, of course, that the railroad administration might not voluntarily pay such judgments, if they may be termed such, as proper claims arising during Federal control.

It is true that Judge Munger held, in Rutherford v. Union P. R. Co. 254 Fed. 880, that Congress had expressly authorized suits against the Director General; but the reasoning of his opinion does not impress us as being at all conclusive. It seems to be based on the hypothesis that the term "carriers," as used in that portion of the act authorizing suits to be brought, refers to the Director General. In our judgment there can be no question whatever that the term "carriers" as so used means the corporations. The term is used in this sense throughout the act. Section 5 affords a good illustration of

such use. There it is provided that "no carrier shall without the approval of the President declare or pay any dividend in excess of its regular rate of dividends," etc., with a proviso that "such carriers as have paid no regular dividends . . . may . . . pay dividends at such rate as the President may determine." This and other provisions so clearly contemplate the continued management of the corporations by their own officers and managers, and so clearly indicate the meaning of the term "carriers" as used in expressing the authority to bring suits, as to make discussion of the question seem superfluous.

In an opinion of the supreme court of New York, just published, in the case of Schumacher v. Pennsylvania R. Co. 106 Misc. 564, 175 N. Y. Supp. 84, it is held that § 10 of the Rail Control Act is unconstitutional for the reason that it attempts to make the railway companies liable for injuries occasioned by the negligence of government employees, thus taking its property without due process of law. It was not even suggested in the case that § 10 was capable of being construed as authorizing suits against the government. So construed, it would not of course be unconstitutional, and were it susceptible of such a construction, it was the clear duty of the court to adopt it, rather than to hold the law invalid as being in violation of the Constitution. So, on the question of statutory construction, this case is a direct authority in support of the conclusion reached in this opinion.

In the case just referred to, the alleged cause of action arose at a time (May, 1918) when it would be affected by the same considerations that govern liability in this case. But as we are not called upon on this appeal to deal with the question of liability, since it cannot arise on the motion, our reference to the case is not to be considered as an expression of opinion upon this matter. For the benefit of appellant's counsel, however, who is charged with the serious responsibility of protecting the rights of his client, we call attention to the following statement in the opinion at page 577 of 106 Misc.: "The questions here presented are not whether the plaintiff has an adequate remedy for the death of her husband, but whether her judgment should be one against the Pennsylvania Railroad Company or against the Director General of Railroads. Her action was begun before order No. 50 was promulgated. Still, she might have asked for the substitution of the Director General, as provided in the order. We are not pre-

pared to say that, even at this date, after the trial and a verdict, she might not amend by substituting the Director General. Certainly, if that official should consent to such an order, the plaintiff ought not to raise serious objection." This court cannot declare the course proper for appellant's counsel to pursue; it can only determine the legal foundation for the compulsory dismissal of plaintiff's action, and the substitution without his consent of a defendant against whom he is unwilling to pursue whatever remedy he has.

It follows from the above propositions, that to sustain the order of substitution would be in effect to deny the plaintiff the right to obtain a judgment that will be binding upon anyone, and thus altogether to deprive him of the right to maintain a suit upon his alleged cause of action.

But both the President in his original proclamation, and Congress in the Act of March 21, 1918, clearly contemplated that the liability of the carriers should continue. We have previously referred to the President's proclamation and the particular portion of the congressional act which provides that carriers shall be subject to all laws and liabilities whether arising under state or Federal laws or at common law, "except in so far as may be inconsistent with the provisions of this act or any other act applicable to such Federal control or with any order of the President." It is not contended that any other act of Congress or that any other provisions of the Act of March 21, 1918, qualified the liability of carriers, and we are cited to no order of the President which purports to limit their liability. Since the liability continues, it is competent for a suitor to resort to the ordinary legal remedies to establish it, and he cannot be denied this right summarily (Muir v. Louisville & N. R. Co. 247 Fed. 897; Angle v. Chicago, St. P. M. & O. R. Co. 151 U. S. 1–19, 38 L. ed. 55–64, 14 Sup. Ct. Rep. 240); though, of course, it would be competent to make reasonable regulations governing the procedure. A regulation which altogether deprives a suitor of obtaining a judicial determination of his right however, is more than a procedural regulation. Other orders of the Director General prescribing procedural regulations, merely, have been held valid, such as the order fixing the venue of actions. See Wainwright v. Pennsylvania R. Co. 253 Fed. 459; Rhodes v. Tatum, —

Tex. Civ. App. —, 206 S. W. 114; but see Friesen v. Chicago, R. I. & P. R. Co. 254 Fed. 875.

If it be argued that the order in question amounts to a limitation of the liability by direct authority of the President within the exception quoted above, the conclusive answer is that the liability, if any, in the instant case, arose before the order was promulgated, and the order could not be made retroactive in its effect upon the liability as distinguished from its effect upon procedure merely. Inasmuch as the order would relieve the carriers from an alleged legal liability previously incurred, we are of the opinion that it is in direct conflict with the second sentence of § 10, which provides that ". . . actions. at law or suits in equity may be brought by and against such carriers, and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal government."

Reasoning in harmony with the above has recently been employed by the court of appeals of Alabama in a criminal case (Vaughan v. State, — Ala. App. —, 81 So. 417), in which a judgment of conviction was dependent upon the sufficiency of an indictment which, in turn, according to the view of the court, depended upon the invalidity of general order No. 50. The conviction was affirmed.

There are some minor questions which are so elementary that it would be unnecessary to refer to them were it not for the fact that they are made the basis of considerable discussion in the dissenting opinion of Mr. Justice Bronson. They relate to procedure. It is strongly intimated that the record does not show that the plaintiff objected to the entry of the order. Suffice it to say that the order is one which necessarily "affects the judgment," and it is one which appears "upon the record transmitted from the district court." It is therefore deemed excepted to, and it becomes the duty of this court, upon appeal, to review it. Comp. Laws 1913, § 7842.

It is suggested that the plaintiff did not claim that the Director General should be interpleaded. The order, which it is contended is. law, does not provide for interpleading the Director General. It provides for substitution and dismissal.

It is also suggested that the plaintiff, by amendment of the com-

plaint or by affidavit, might have attempted to show that there was a legal responsibility claimed against the railway company. The complaint needed no amendment in this respect. If it did not state a cause of action against the defendant railway company, it was of course subject to demurrer, and the suggestion that a complaint may be aided in its allegations by an affidavit which is not part of it is so novel as to amount to an invention in pleading. It is not at all surprising, therefore, that counsel would not attempt it.

Since the foregoing opinion was written, a pamphlet has been received containing the statements of Mr. Walker D. Hines, Director General of Railroads, before the Interstate Commerce Commission of the United States Senate, concerning the extension of tenure of government control of railroads. At page 21, Mr. Hines refers specifically to general order No. 50, as follows: "At this point I want to refer to general order No. 50. That refers to suits brought against the Director General. There, again, we had a situation which was developing confusion. Of course, general order No. 50 is designed to deal with certain classes of causes of action that arise against the government while the government is in control of the railroads, causes of action for which the government is liable and for which the corporation is not liable. Claims were beginning to be made in various parts of the country that the corporation itself was not liable for a cause of action arising against the government while it was in control, and plaintiffs were being embarrassed because they were not certain where they were going to come out if they sued the corporation. It seemed a reasonable rule, and really in the interest of plaintiffs,—and it did not have any relation to anything else or cause any disturbing factors,— to provide that where those causes of action arose against the government, in effect that suits should be brought against the Director General. It still left the plaintiffs free to sue, just as they could sue before, and to make service of process on the local railroad agents, just as they could make it before. It did not, as we see it, impair the rights of the plaintiffs at all, but it cleared up the situation by making it perfectly clear that they would have a procedure that would be free from attack. Of course, that does not apply to suits brought against the corporation for causes of action arising prior to Federal control. Those would be brought as heretofore; but as to suits arising under

Federal control, where it was perfectly clear that the corporation was in no way liable, it was believed that it was in the interest of the plaintiffs themselves to give them a clear-cut procedure; and general order No. 50, so far as I understand it, does not embarrass their opportunity to sue in any locality. Of course, that is affected by general order No. 18, which I have already explained."

The validity of the order, in so far as it is compulsory upon the plaintiffs, does not depend upon the propositions advanced by the Director General. Even assuming the correctness of the two propositions,— (1) that the government is liable; and (2) that the corporation is not liable,— the order cannot be supported, for it does not appear that the Director General has been vested with any authority to control the actions of plaintiffs, who seek to establish the liability of carriers, nor with the right to intercede on behalf of the carrier corporation. The right to intervene, however, to protect the interests of the government, is not here involved and is not considered. A plaintiff who is desirous of testing merely the liability of a carrier corporation cannot be made to test unwillingly the liability of the government.

The nonliability of the carriers is, as elsewhere indicated in the opinion, a judicial, not an administrative, question, and can only be decided by a court when the defense is properly raised. As illustrative of the character of the difficulties involved in the final determination of this question, we call attention to the fact that prior to August 1, 1918, the Director General exercised possession and control exclusively through the officers, directors, and agents of the railway corporations, thus recognizing their agency to act for the corporations under his directions; while, since August 1st, all administration of transportation has been effected through officers and agents directly appointed by the Director General. These are not recognized as agents of the corporations. The legal effect of these different methods under the acts of Congress is clearly for courts to determine as the questions properly arise, unless Congress has prescribed a different mode. It appears to us that it has not done so.

For the foregoing reasons, we hold that the order in question is void as involving an unwarranted deprivation of the plaintiff's alleged cause of action, and as being contrary to the governing acts of Congress.

passed to meet the war emergencies. It follows that the order appealed from must be reversed. It is so ordered.

ROBINSON, J. (concurring). I fully concur in the syllabus and in the result of the decision as written by Mr. Justice Birdzell. The Director General was not made a dictator. He had no legislative power or authority to establish a special code of civil procedure. His orders concerning the court procedure in civil actions is manifestly dictatorial and wholly void. Indeed, in this land of liberty and constitutional law, it is amazing that any person of ordinary intelligence should ever think of making or regarding such orders.

BRONSON, J. (dissenting). In order to give full consideration to the determination made by the majority opinion of this court it is deemed necessary and proper to restate the facts of the record herein.

This action was instituted in the name of Vallie Hanson, as administratrix, by service of process on March 2, 1918, upon the agent of the Great Northern Railway Company, and, on March 4, 1918, upon Nels Nelson and Edward Hall, additional defendants named in the action. The complaint alleges that the deceased, Christ Hanson, while employed as a carpenter by the Great Northern Railway Company, and while engaged in interstate commerce, was run over by a locomotive of the railway company on June 22, 1918, occasioning injuries which resulted in his death. That then the defendants Nels Nelson and Edward Hall were each, respectively, a locomotive engineer and a fireman in the employ of such railway company; that at such time, the railway company was a common carrier engaged in interstate commerce, and that this action was brought in the state court under the Federal Employers' Liability Act.

On October 9, 1918, notice of motion was served on the attorneys for the railway, returnable October 24, 1918, to dismiss the action as against said Nelson and said Hall, and to substitute McGregor as administrator in place of said Vallie Hanson. Pursuant to such motion the court did dismiss the action as against said Nelson and said Hall without prejudice, and substituted said McGregor in place of said Hanson, as administrator. On November 27, 1918, an amended complaint was verified, the same being filed in the trial court on

December 20, 1918, setting forth a cause of action upon the grounds hereinbefore stated against the railway company alone. On November 29, 1918, the attorneys for the railway company served a notice of motion, returnable December 10, 1918, to substitute the Director General as the party defendant in such action and to dismiss the said railway company as a party defendant. This motion was supported by an affidavit setting forth that the railway company was under government control and has been since January 1, 1918, that its property and its business was not now subject to the jurisdiction, management, or possession of such railway company, but that the same was under the exclusive management and control of the United States government; that the cause of action stated in the complaint arose during the period of Federal control and operation and grew out of the possession, use, control, and operation of such railway by the Director General. The affidavit further quotes the provisions of general order No. 50 issued by the Director General. To this motion, so made, no counter affidavit, nor objection of any kind, was made by the plaintiff. On December 10, 1918, the trial court ordered the Director General substituted as the party defendant instead of the railway company, and dismissed the railway company as a defendant therein.

On December 19, 1918, the plaintiff appealed to this court from the order so made. For the purpose of consideration of the principles of law applicable, the following acts of Congress, proclamations of the President, and orders of the Director General are pertinent:

The Act of Congress of August 29, 1916, granting authority to the President in time of war to assume Federal control of railroad transportation systems.

The Act of Congress of March 21, 1918, further providing for Federal control of railway transportation systems.

The proclamation of the President dated December 26, 1917, assuming Federal control of railway transportation systems.

The proclamation of the President of April 11, 1918, with reference to such Federal control.

General order No. 18 and 18-A, dated respectively April 9, 1918, and April 18, 1918, issued by the Director General, providing that suits against carriers, while under Federal control, must be brought in the county or district where the plaintiff resides at the time of the

accrual of the cause of action or in the county or district where the cause of action arose.

General order No. 26, dated May 23, 1918, providing for a stay of the trial of the actions against carriers under Federal control under certain circumstances.

General order No. 50, of the Director General, dated October 28, 1918, providing for substitution of the Director General instead of the carrier, and dismissing the company as the defendant in causes of action arising out of the operation of the railway under Federal control.

This court will take and has taken judicial notice of these acts, proclamations, and orders. The appeal, therefore, is before this court upon such record.

The majority opinion denying the right of the Director General to be substituted as the party defendant is based broadly upon the propositions that plaintiff's cause of action had vested prior to the issuance of general order No. 50 and hence could not be affected by such order, and further that, under the Rail Control Act (Act March 21, 1918), the Director General was not authorized to appear and defend suits against carrier corporations, under Federal control upon causes of action which arose through, or on account of, Federal control or operation.

The majority opinion also holds, as an incidental proposition, that such carrier corporations, while their transportation systems are under Federal control, are still capable of suing and being sued concerning matters involved or occurring during the Federal operation of such transportation system, and that the question of their liability is a judicial question.

The nature and extent of the Federal authority and control exercised in war time for war purposes over the railway transportation systems is the sole question involved.

In the recent rate cause (State ex rel. Langer v. Northern P. R. Co. — N. D. —, 172 N. W. 324) decided by this court, the writer, in a dissenting opinion, discussed at some length the war powers of Congress and nature and extent of the war powers conferred by it upon the President, under the Acts of August 29, 1916, and March 21, 1918.

Reference, therefore, is herewith made to that case without restating the same in this opinion.

It is deemed proper, however, to state broadly the general considerations or principles of law that obtain, in my opinion, in interpreting or construing the war powers of the President or of the Director General, in the Federal operation of railways.

In the Federal management and operation of the railway transportations by the President, pursuant to the acts of Congress, one of two legal conceptions must obtain.

Either, it was the intent and purpose of Congress and our government, in the exercise of these war powers, to make the transportation systems involved a Federal instrumentality, in fact, operated by and under governmental authority; or, it was the intent and purpose to use the railroads in the war emergency as private instrumentalities, for the purposes needed, leaving the railroad corporations, owning the same, responsible either in contract or in tort upon causes of action arising on such transportation systems, during the period of, and while under the operation of, Federal control.

The reasoning of the majority opinion in this case, as well as in the rate case (State ex rel. Langer v. Northern P. R. Co.) adopts, in effect, the second conception. By a narrow construction the majority opinion first find, in effect, that Congress has not authorized the Director General to relieve the railway corporation of a liability for a cause of action arising during and on account of Federal control. Then it finds that Congress, under the Act of August 29, 1916, legislated, and the President pursuant thereto, by his proclamation, declared that a cause of action would exist and vest in a plaintiff against the railway company, for acts of alleged negligence that might arise during the period of, and on account of, Federal control and operation. In effect the majority of the court treat the railway corporations as still in control and responsible for the operation of the railway transportation systems, even though managed and absolutely controlled, in fact, by the Federal government. They assert and hold that such corporations may sue and be sued as formerly, and that judgments obtained give rise to the same remedies for enforcement except that their transportation systems are not subject to levy or seizure. Then, by way of possible concession, the majority opinion further finds that it

is barely possible that the railway company is not liable for alleged causes of action that may arise as the result of the government control, but that this is a matter of defense for the railway company. And, so, the suitor is placed between the rocks of Scylla and the shoals of Charybdis, with the court denying the right to maintain an action against the Director General, and the railway companies asserting that they are not liable for acts over which they had no control, and which they did not commit. Thus, by narrow construction are the railway transportation systems treated as private agencies.

Readily, perhaps, through such grounds of narrow construction, and from such viewpoint, may the conclusion be reached that the Director General possessed no authority to issue general order No. 50, and that a cause of action did vest in the plaintiff in the month of January, 1918, against the railway corporation, irrevocable and with no right of substitution, for alleged acts of negligence occasioned by and under the Federal control and operation of the transportation system formerly operated and controlled by the corporation.

If, on the other hand, the Federal control and operation of the transportation systems taken be regarded as Federal instrumentalities operated for and by the government; if, further, the acts of Congress and the powers conferred thereby upon the President be construed in accordance with the elemental rules that what is implied in a statute is as much a part of it as what is expressed, and that when a power is conferred by statutes everything necessary to carry out the power and make it effectual and complete will be implied (Dooley v. Pennsylvania R. Co. 250 Fed. 142; Wilson County v. Third Nat. Bank, 103 U. S. 770, 26 L. ed. 488), and if, further, the surrounding circumstances and exigencies then existing, with an approaching and pending great crisis in this nation's existence, in a time of war, be considered in understanding the intent and purpose of Congress and the objects sought to be accomplished, little difficulty is experienced in determining the nature and extent of the Federal power and the Federal control over the transportation systems.

The assumption of Federal control over railway transportation systems, theretofore operated by private corporations as individual units, with no general Federal law machinery then applicable to actual operation, was necessarily a large undertaking.

If, upon the assumption of Federal control, radical changes were then made in the form of the methods and dealings of such transportation systems, then existing in their relations with the public, the Federal administration might have been seriously embarrassed, as well as the co-operation of our people hindered and impaired, in the prosecution of the war, then threatening and almost pending.

A mere review of the acts of Congress, of the President, and of the Director General, serve to show that the Federal government tried to assume Federal control with as little disturbance as possible to the then customary formal relations of the common carriers to the public.

Thus, when the Federal control was first assumed, the actual form of the private management of such carriers, then existing, was continued; the same formal methods of securing redress for private suits was followed. Later, however, and progressively as the acts, proclamations, and orders show, Federal control in form as well as in fact was assumed. It soon became necessary to restrict the right of levying execution against the properties of the transportation systems. It became necessary to limit the places where causes of action might be maintained. Also, it became proper to provide for delay or postponement of trials of action upon causes of action arising from the Federal operation of railways. It also became necessary to prescribe additional revenue through increased rates for the maintenance of such transportation systems, and the increased expenses and pay to railway employees. It became necessary, further, to direct substitution of the Director General in place of the transportation company as defendant. And finally, under general order No. 50-A, it has further been provided that no bond or security should be required of the Director General in prosecuting an appeal upon an action maintained against him. From the Act of Congress of August 29, 1916, down to the last order of the Director General, promulgated just a few months ago, there is discerned in the acts, proclamations, and orders of the Federal authority a progressive assumption, in form as well as in fact, of direct Federal control, and operation of the transportation systems. There is disclosed, without question, an intent and purpose to consider and to treat such transportation systems as a Federal instrumentality. There really is no question that the President and the Director General have so done. There is no question that they deemed the control a govern-

mental control, a governmental operation in fact, and a government liability to exist therefor. In his report for 1918 the Director General stated, "It having been found that suits were being brought, and judgments and decrees rendered against carrier corporations on matter based on causes of action arising during Federal control, for which the carrier corporations were not responsible, general order No. 50 was issued on October 28, 1918, providing," etc.

Very recently the new Director General, Mr. Hines, before the Interstate Commerce Commission of the United States Senate, explained the reasons for the issuance of said order No. 50. In part he said: "At this point I want to refer to general order No. 50. That refers to suits brought against the Director General. There, again, we had a situation which was developing confusion. Of course, general order No. 50 is designed to deal with certain classes of causes of action that arise against the government while the government is in control of the railroads,—causes of action for which the government is liable and for which the corporation is not liable. Claims were beginning to be made in various parts of the country that the corporation itself was not liable for a cause of action arising against the government while it was in control, and plaintiffs were being embarrassed because they were not certain where they were going to come out if they sued the corporation. It seemed a reasonable rule, and really in the interest of plaintiffs,—and it did not have any relation to anything else or cause any disturbing factors,—to provide that where these causes of action arose against the government, in effect that suits should be brought against the Director General."

It ought to plainly appear that the intent and purpose of our government has consistently displayed a course of action granting and intending to grant such authority as was needed and such as the occasion demanded for the operation and control of the transportation systems as a Federal instrumentality, in fact. The majority opinion fundamentally fails to recognize that, in war times, peculiar war powers necesarily exist to enable the sovereign power to carry on and devote its supreme powers to protect its sovereignty and its people in a successful prosecution of a great war, and that necessarily in the exercise of such powers civil rights in many and numberless instances become subordinate. If, in fact, the transportation systems were operated

and controlled as a Federal instrumentality, pursuant to a power so conferred by Congress on the President, there ought to be no question that Congress had authority to authorize the President and the Director General to provide, by an order, when a cause of action could be instituted against it, founded upon a claim, in contract or in tort, occurring during the period, and on account of Federal control. If the transportation systems are federally operated as a Federal instrumentality, liabilities that arise therefrom are Federal liabilities; and causes of action, if any, that arise, are causes of action upon these Federal liabilities. The majority opinion, in attempting by narrow construction to reason out an intent of Congress providing for a suit against a carrier corporation, for acts of Federal control, are forced into a position which inferentially recognizes the right to hold responsible a railway corporation for a cause of action concerning which it had nothing to do, and for which it is not legally responsible, and it thereby presents the other situation, which permits such carrier corporation to come in the court and show as a defense that it was not so legally responsible for the cause of action alleged, on account of the roads being under Federal control.

Accordingly the cause of action which they are seeking so strongly to protect and preserve for the plaintiff is merely a sham and a fiction, unless the railway company be deemed merely a nominal defendant for the government. Concerning the nature of these war powers exercised by the President, and the extent of the same, there are now several decisions interpreting these orders issued by the Director General, or involving the exercise of Federal powers over railroads. Thus, in Muir v. Louisville & N. R. Co. 247 Fed. 888, the cause of action arose on December 20, 1917, prior to the assumption of Federal control; the right of removal to the Federal courts upon the ground that the suit arose under the Constitution or laws of the United States was denied when suit was instituted on January 9, 1918, because a cause of action had theretofore vested. In Moore v. Atchison, T. & S. F. R. Co. 106 Misc. 58, 174 N. Y. Supp. 60, where a cause of action arose for damages to property in interstate commerce prior to the assumption of Federal control, the court denied the application of general order No. 18 on the grounds that the President had no power to make an order which would destroy or extinguish a right of action

already existing against a railroad company. In Friesen v. Chicago, R. I. & P. R. Co. 254 Fed. 875, the acts of negligence complained of arose on May 21, 1916, and the court held that the action could be maintained regardless of general order No. 18 and 18a, upon a cause of action not arising out of the railway company's duties as a common carrier. Judge Munger, in this case, in construing § 10 of the Act of March 21, 1918, which provides "that carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or Federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such Federal control or with any order of the President," stated: "It will be noted that by the terms of § 10, the carriers are not made subject to all Federal and state laws, but are subject only to all laws and liabilities 'as common carriers.' In many relations to the public, carriers are governed, not by the rules applicable to common carriers, but by rules relating to them merely as corporations, as contracting parties, or as owing duties apart from the carriage of goods or passengers. The use of the words 'common carriers' is thus distinguished from the word 'carriers,' which is used in the first sentence of this section and in many places in the same section, and in other sections of the act. The probable effect of the discrimination in the use of these words was pointed out in the debate in the Senate (56 Cong. Rec. 3576, 3580). If Congress had desired to leave to the President the entire control and management of the railways of the United States by executive orders, the former act of Congress did not require amendment; or, if Congress desired to continue the grant notwithstanding the careful restrictions in the second act, it could have employed the words 'carrier' or 'railway companies,' instead of the words 'common carriers,' and omitted the words 'except so far as may be inconsistent with the provisions of this act.' The plain meaning of the words used in this section is that the laws then existing governing the relationship of the railways as common carriers were to remain in effect except when they were inconsistent with the terms of that act of Congress or of any other act applicable to Federal control or with any order of the President. Orders of the President relating to the carriers' duties and liabilities, other than as common carriers, were not authorized by this portion of § 10. The authorization

of the bringing of an action at law as then provided by law, against the railway company, upon a cause of action not arising against it as a common carrier, was therefore not subject to an order of the President limiting the districts in which such an action could be commenced, because of anything contained in this section of the act of Congress."

In United States R. Administration v. Burch, 254 Fed. 140, where an execution was levied upon railroad property not used or essential to the performance of the duties of the railway company, or of the Federal government as a common carrier, it was held that the Federal government was not in possession of such property, and that therefore the exemption from execution, under the Act of Congress of March 21, 1918, did not apply. In Rhodes v. Tatum, — Tex. Civ. App. —, 206 S. W. 114, a cause of action arose on January 23, 1917, when the plaintiff was injured while crossing the tracks, in the switch yards, of the defendant railway companies. The action was commenced in August, 1918. The defendant railway companies filed pleas in abatement, alleging Federal control and supporting their motions by general orders No. 18 and 18a and 26. It was held that these orders were authorized by the congressional acts, and that they applied to the instant case, the plaintiff's right to sue not being infringed. In Rutherford v. Union P. R. Co. 254 Fed. 880, an action for damages was brought against the railway company sustained by a passenger after December 31, 1917. The suit was instituted on October 26, 1918. The railroad company presented a motion to substitute the Director General as the defendant pursuant to general order No. 50. The plaintiff claimed that under the terms of § 10 of the Act of March 21, 1918, which provides "actions at law, or suits in equity may be brought against such carriers and judgment rendered as now provided by law," entitled him to maintain such action, and that order No. 50 violated this provision. With this decision, the majority opinion necessarily must, and does disagree. Judge Munger, in part, stated:

"From and after the taking possession of the railroads by the President, the corporations or persons who had previously controlled them ceased their functions and obligations as carriers. While goods and passengers continued to be carried, the carriage was conducted by the Director General. The acts of the former officers and employees. who retained their positions and conducted the details of operation, were the

acts of the Director General. The part of § 10 of this Act of March 21, 1918, on which the plaintiff relies, did not provide that actions at law might be brought by and against the railway corporations, but did provide that they might be brought against 'such carriers,' and this referred to the 'carriers while under Federal control' mentioned in the first part of the section. It would have been an anomaly to have given the actual control of the railroads to the Director General, and to have provided that suits arising out of his acts should be brought against the corporations who had been devested of authority over those acts. Moreover, the language which immediately follows that portion of the statute relied on by plaintiff demonstrates that the 'carrier' who is subject to suit is the agent of the President, who is operating the railroads. The language is: 'And in any action at law or suit in equity against the carrier no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal government.'

"The corporations or persons who had lost control and possession of the railroads would have no occasion to assert the defense that they were instrumentalities or agents of the government as to acts which occurred after their control had terminated.

"Under these acts of Congress and the proclamation of the President the Director General is a carrier. He conducts the business of receiving and transporting goods and passengers for hire. A receiver of a railway company is a carrier as to the goods and passengers transported (United States v. Nixon, 235 U. S. 231, 234, 59 L. ed. 207, 208, 35 Sup. Ct. Rep. 49; United States v. Ramsey, 42 L.R.A.(N.S.) 1031, 116 C. C. A. 568, 197 Fed. 146), and the office of the Director General is analogous to that of a receiver of the railway companies.

"By the acts of Congress, the President was given authority to exercise the control of the railroads by such agencies as he should determine. He may appoint one or many persons, or one or many partnerships or corporations to carry out his will and to perform the business of carriage of goods and passengers over the several railroads. The purpose of Congress in the giving the right to bring suits against the carriers was to give the right of suit by or against any of such agencies as should be engaged in the actual control of the operations of the railroad after the President assumed control. The order of the Director General, therefore, does not conflict with the language

of this statute, but is pursuant to and in execution of it, and was authorized by the power conferred on him."

In Cocker v. New York, O. & W. R. Co. 253 Fed. 676, the cause of action arose on August 9, 1916; the action was commenced against the railway company in the Federal court in New York contrary to the provisions of general orders No. 18 and No. 18a. The plaintiff's ward was injured at Scranton, Pennsylvania. Motion was made in June, 1918, to stay the trial under general order No. 26. The court assumed that the Director General had the power to make these general orders, and that they had the force and effect of law, and granted the motion. In Wainwright v. Pennsylvania R. Co. 253 Fed. 459, the plaintiffs brought an action under the Federal Employers' Liability Act for the death of her husband on December 26, 1917, while engaged as an employee of the railway company, through its alleged negligence. The action was instituted May 6, 1918, in the Federal court of Missouri. The deceased resided and the cause of action arose in Pittsburgh. The defendant entered a plea of abatement setting up general orders Nos. 18a and 26. It was held that Congress had authority to authorize the general orders in question to apply to the Federal courts; that the right to maintain an action in any particular court is subject to the legislative will; that it is only when one is deprived of all rights to maintain an action for redress of his wrongs that the statute would be obnoxious to the 5th Amendment of the statute. The court cites for illustration the Carmack Amendment, authorizing an action against the receiving carrier regardless of the fact that the loss or damage sued for was covered by the damage of a connecting common carrier. Also the Act of February 24, 1905, chap. 778, vesting exclusive jurisdiction of actions on bonds of contractors for the construction of public works in the courts of the district in which said contract was to be performed and executed. It was further held that the act of Congress was not void because vesting administrative officers with legislative discretion or power, citing Selective Draft Law Cases (Arver v. United States) 245 U. S. 366, 62 L. ed. 349, L.R.A.1918C, 361, 38 Sup. Ct. Rep. 159, Ann. Cas. 1918B, 856.

The court construes § 10 of the Act of March 21, 1918, with reference to the general orders in question, and as to whether Congress granted power so to make, as follows: "Counsel for plaintiff contend

that it does not, relying upon that part of § 10 of the act which reads: 'Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law.'

"In the opinion of the court all this quotation means is that any person having a cause of action shall not, by reason of this act or any regulation made thereunder, be deprived of the right to maintain it in a proper court, if, under the state, Federal, or common law, he is entitled to a legal remedy. It does not mean, as claimed, that, having a cause of action against the carrier, he has the right to institute it in any forum in which he could have brought it before the passage of this act."

In Dooley v. Pennsylvania R. Co. 250 Fed. 142, decided May 10, 1918, garnishment process was served on certain railway companies on January 29, 1918. The disclosure showed that the garnishees had certain traffic balance in their hands belonging to the defendant railway company. The defendant company and the garnishees had been taken under Federal control prior to the garnishment. Motion to quash was made under provision of the proclamation of the President dated December 26, 1917, providing as follows: "Except with the prior written assent of said Director, no attachment by mesne process or on execution shall be levied on or against any of the property used by any of said transportation systems in the conduct of their business as common carriers; but suits may be brought by and against said carriers and judgments entered as hitherto until and except so far as said Director, may by general or special order, otherwise determine."

It was held that the President under the Act of August 29, 1916, authorizing Federal control, was fully authorized and warranted to prohibit levies by attachment or execution upon properties used by transportation systems in the conduct of their business of common carriers while under Federal control. The court said concerning the rule of construction: "It is elementary that what is implied in a statute is as much a part of it as what is expressed. Wilson County v. Third Nat. Bank, 103 U. S. 770–778, 26 L. ed. 488–491; Little Rock v. United States, 43 C. C. A. 261, 103 Fed. 420. It is also elementary that, when a power is conferred by statute, everything necessary to carry out the power and make it effectual and complete will be implied. 26 Am. & Eng. Enc. Law, 2d ed. 614, and cases cited. This is the

same principle that is well established in the law of agency. Mechem, Agency, 2d ed. 789."

In Schumacher v. Pennsylvania R. Co. 106 Misc. 564, 175 N. Y. Supp. 84, the plaintiff brought the action for the death of her husband, killed while working as a yard master near Buffalo in the month of May, 1918. The railway company alleged in its answer that its transportation system had been taken over by the Federal government, and that it was not legally responsible for the accident. The trial court overruled the objection, and a verdict resulted for the plaintiff. Upon motion for a new trial it was held that § 10 of the Act of March 21, 1918, authorizing actions and judgments against carriers for damages sustained by employees, while the railroad is being operated by Federal authorities, was unconstitutional because it subjected to liability and seizure the property of the railway company for injuries to its former employee, while its property is under Federal control. It is also held that the act was also unconstitutional because taking private property for public use without just compensation, and because it deprived the railroad of the equal protection of the law in subjecting its property to liability and seizure for injuries to a former employee while its property was under Federal control. The court in construing § 10 of the Act of March 21, 1918, stated as follows:

"Section 10 expressly authorizes 'judgments rendered as now provided by law.' If this language means anything, it means a judgment having all the essential features of ordinary judgments obtained in the usual way, and negatives the claim that such a judgment is merely a method of ascertaining the liability of the government. A judgment of a court of competent jurisdiction is something more than a mere declaration of liability. It necessarily carries with it the right of satisfaction, the right to resort to the usual and ordinary proceedings provided for its collection. It directs and decrees that the successful party 'recover' of the defeated party a sum stated and have execution therefor. Judgments not only establish a liability, but give the right to collect.

"The Federal government, in the control and operation of the railroad properties taken over, is in no sense the agent or representative of the railroad companies to whom the systems belong. By the 12th section of the act the moneys and other property derived from the

operation of the carriers during Federal control are 'declared to be the property of the United States.' If a profit is realized from such operation, the profit belongs to the United States. By § 8 the President is given power to exercise the powers granted him with relation to Federal control 'through such agencies as he may determine, and may fix the reasonable compensation for the performance of services in connection therewith.' In other words, the Federal government, in the operation of the systems taken over, acts as the principal, and not as the agent, of the owners of the transportation systems, becoming a lessee of the railroad on terms agreed upon between it and the companies. Where no agreement as to rentals is reached,. and where no such formal leases are entered into, the government is to pay such a rental as may be thereafter determined reasonable and just by and in the methods prescribed. In short, the relation between the government and the carrier is nothing more or less than that of lessor and lessee; the lessee operating the road for itself and on its own account. The employees engaged in operating the various systems are for the time being at least the government's servants and agents, subject to its directions, paid by the government, and subject to dismissal by it. This relation of the government and the carrier between themselves and to their employees and to the general public has been fully and repeatedly recognized by a series of orders issued by the Director General of Railroads under Federal control. We need but instance what is known as general order No. 8, by which the Director General directs that all acts of Congress to promote the safety of employees and travelers must be complied with, and then proceeds in this language : 'Now that the railroads are in the possession and control of the government, it would be futile to impose fines for violations of said laws and orders upon the government; therefore it will become the duty of the Director General in the enforcement of said laws and orders, to impose punishments for wilful and inexcusable violations thereof upon the person or persons responsible therefor, such punishment to be determined by the facts in each case. . . .'

"The questions here presented are not whether the plaintiff has an adequate remedy for the death of her husband, but whether her judgment should be one against the Pennsylvania Railroad Company or against the Director General of Railroads. Her action was begun

before order No. 50 was promulgated. Still she might have asked for the substitution of the Director General, as provided in the order. We are not prepared to say that, even at this date, after the trial and a verdict, she might not amend by substituting the Director General. Certainly, if that official should consent to such an order, the plaintiff ought not to raise serious objection."

With this case, again necessarily, the majority opinion herein must disagree.

In the case of Vaughan v. State, — Ala. App. —, 81 So. 417, decided March 18, 1919, an appeal was taken from a verdict rendered by the jury, upon an indictment charging the defendant with concealing or receiving certain tobacco, the property of the railway company. Upon appeal it was contended in the bill of exceptions that there was a fatal variance between the averment and the proof, because the railway system, at the time, was under Federal control. The court held that the identity of the carrier was not destroyed, nor was it rendered wholly impotent in respect to its functions in the conduct of business. That it was sufficient to lay the ownership of the goods in question in the railway corporation in an indictment for the larceny thereof. The court discusses general order No. 50, and questions whether the making of the same is within the scope of the Director General's authority. The court said that, assuming that such order was within his authority, it was sustainable on no other theory than that the transportation companies themselves are under Federal control. Also the court stated that the apparent theory of general order No. 50 is that, while the carriers are operating under Federal control, they are mere agents of the government, and, if liabilities for their torts and the torts of the employees exist, it is against the government, and not the carrier. The court further said: "There is no proof in this case that the railroad administration, in the exercise of Federal control, has excluded the transportation companies from the exercise of their functions in the operation of their respective systems, and we cannot assume that it has done so, contrary to the manifest purpose and spirit of the authority conferred by the act of Congress and the proclamations of the President. The foregoing considerations lead us to hold that the Louisville & Nashville Railroad Company is under Federal control and is exercising its functions and operating its system as an agency of the government, and

as such was bailee of the property alleged to have been stolen, and the ownership thereof was properly laid. This disposes of all questions presented by the record, and, finding no error therein, the judgment will be affirmed.

The court further states: "If such companies are in no way connected with the operation of their respective transportation systems, we submit that it would not be within the power of Congress to subject them to liability and suits thereon for the torts, miscarriages, and defaults of the employees of the Federal government. Such an act would be an arbitrary exercise of legislative power, contrary to the established principles of private rights and distributive justice, and tantamount to a denial of due process of law."

This case is cited and relied upon by the majority opinion.

In Commercial Club v. Chicago, M. & St. P. R. Co. 41 S. D. 314, P.U.R.1919C, 52, 170 N. W. 149, decided December 31, 1918, where the question involved was the right of the Board of Railroad Commissioners to compel the railway company to construct and maintain a connecting track. Upon appeal, the court directed the Commissioners to withhold action during such time as the government retained control of the railroads, unless the consent of the government be secured. The court said: "As a war emergency act, the United States government has assumed control and management of most of the railroads of the country, including those involved in this case as well as the material and labor necessary for the construction and extension thereof. So long as this condition exists, the order of the Board of Railroad Commissioners cannot be enforced without the consent of the government, and, so long as this condition exists, an attempt by this court to enforce such order would be futile."

We now come to a consideration of the main proposition, upon which the majority opinion rests, that a cause of action had vested in the plaintiff, prior to the issuance of this order involved herein. Pray, what cause of action did the plaintiff possess against the railway corporation in the month of January, 1918? The accident occurred through alleged negligence of operatives employed by the Federal government, and on account of alleged negligence occurring during Federal control. At that time the railway corporation had then no control or domination over the management or the operation of its transporta-

tion line. It then had no control over its employees. The mere fact that Congress or the President, prior thereto, had permitted an action to be brought against such railway corporation does not mean that Congress legislated that the corporation should be liable for acts over which it had no control. If so, there is no reason why the cause of action should not now proceed to trial against the defendant railway company; why judgment may not be rendered and execution enforced out of the private property of such railway company not used for transportation purposes.

It is apparent that such reasoning is not sound. The unsoundness thereof is practically admitted by the majority opinion when it further asserts that possibly the defendant railway company may not be liable for such acts, but that the right to sue such defendant company thereby should not be denied. Ordinarily, if a cause of action is vested the same is termed a property right, and the plaintiff is entitled to pursue it, and to recover and enforce a judgment against the party against whom such cause of action is vested. Clearly, in the majority opinion, the so-termed vesting of the cause of action has not been considered.

If the majority opinion mean by the term "cause of action" a claim which may be enforced, subject-matter for which an action may be brought, the subject-matter of the controversy, the ground or reason for the action, or the ground upon which an action may be maintained, as sometimes defined in the abstract, or as the facts which give rise to an action, or the existence of those facts which give a party the right to judicial interference in his behalf, as often defined in reference to pleadings (1 C. J. 936), Congress or the Director General have not attempted to deny plaintiff his cause of action. The question whether Congress could so deny the plaintiff his cause of action, being in effect against the sovereign power and its consent therefor being necessary, is not before us, because Congress and the Director General have specifically permitted such cause of action to be maintained.

If the majority opinion mean by the term "cause of action" the right to maintain the same against the railway company, whether it be liable or not, whether there is any liability under the terms of the Federal Liability Act or not, simply because the plaintiff has the right to sue whom he pleases, then the answer is that such alleged cause of

action never did vest in the plaintiff. For, under any fundamental consideration, there first had to be a right in the plaintiff and a breach of duty or a wrong in relation thereto by the defendant (1 C. J. 938). No breach of duty is predicated in the majority opinion on the part of the defendant railway company. On the contrary, the opinion entertains doubt whether there is any liability. It asserts that Congress has legislated a cause of action; that the state court will not deny the plaintiff the right to maintain it against such company.

Thus do we proceed around the circle.

The only cause of action possessed in any event by the plaintiff in the month of January, 1918, upon the face of the complaint, was a cause of action against a common carrier engaged in interstate commerce under the Federal Employers' Liability Act. Under the terms of this act, which could be maintained only pursuant to congressional authority, a cause of action exists only when the defendant is a common carrier by railroad, then engaged in interstate commerce, and while the employee is so engaged. Note in 47 L.R.A.(N.S.) 74; Taylor v. Southern R. Co. 178 Fed. 380. Under its authority to regulate interstate commerce, Congress legislated concerning the liability of such common carriers, and upon the passage of such act it superseded all state legislation or authority of the state concerning such subject-matter. Note in 47 L.R.A.(N.S.) 47; Second Employers' Liability Cases (Mondou v. New York, N. H. & H. R. Co.) 223 U. S. 1, 56 L. ed. 327, 38 L.R.A.(N.S.) 44, 32 Sup. Ct. Rep. 169, 1 N. C. C. A. 875.

In the case of Mondou v. New York, N. H. & H. R. Co. supra, it was contended that this act was not in accord with the policy of the state respecting the liability of employers to employees for injuries received by the latter while in the service of the former. In other words, that the act interfered with the local laws of the state as well as the local jurisdiction of the courts. In that case the court said: "The suggestion that the act of Congress is not in harmony with the policy of the state, and therefore that the courts of the state are free to decline jurisdiction, is quite inadmissible, because it presupposes what in legal contemplation does not exist. When Congress, in the exertion of the power confided to it by the Constitution, adopted that act, it spoke for all the people and all the states, and thereby established a policy for

all. That policy is as much the policy of Connecticut as if the act had emanated from its own legislature, and should be respected accordingly in the courts of the state."

Then again, under the very terms of the Employers' Liability Act, the state court is given a concurrent jurisdiction with that of the Federal courts upon the cause of action created thereunder. Fed. Stat. Anno. Supp. 1916, p. 761; Mondou v. New York, N. H. & H. R. Co. supra; note in 47 L.R.A.(N.S.) 72. Although matters related to procedure and practice are generally governed by state laws, yet the state courts may not so proceed as to work a change in the terms of the Federal statutes or in the enactments of Congress with relation thereto. Fed. Stat. Anno. Supp. 1916, p. 768. Accordingly the plaintiff's cause of action exists only pursuant to congressional authority. The Federal government upon assuming Federal control did not become an agent or representative of the railway company. Schumacher v. Pennsylvania R. Co. 106 Misc. 564, 175 N. Y. Supp. 84. The majority opinion of this court concede that the Director General does not act as the agent of the railway company. Therefore the conclusion inevitably follows that the acts of the government in the Federal control exercised, in fact, are government acts, are the acts of Federal instrumentalities, are government acts as common carriers; in place of the corporations formerly acting and operating as common carriers. Consequently, on the face of the complaint, no cause of action exists as against the defendant railway company as such. The common carrier engaged in interstate commerce in the month of January, 1918, was a Federal instrumentality; the government control then operative. A control that reached not only to the employment and pay of the employees, but reached also into every action of the transportation systems in its operations.

It therefore ought to appear that the duties and obligations of common carriers were assumed by the Federal government in law as they were and have been assumed in fact. No other logical conclusion can be drawn from the acts of Congress and the acts of the President and the Director General thereunder, unless it must be assumed that the former carrier corporations are to be held responsible for acts and obligations not of their making and over which they had no control.

It therefore follows that in the month of January, 1918, the plain-

tiff possessed no cause of action, on the face of his complaint, against the defendant railway company, excepting such right as Congress and the President has theretofore prescribed for bringing an action to determine the liability of the Federal control. In other words, the only reason why the defendant railway company could be sued nominally as a defendant, prior to general order No. 50, was through the express consent of Congress providing for such a method of bringing a cause of action that arose during the period and on account of Federal control, to trial and determination. If the alleged cause of action had existed in ordinary times against such company, prior to Federal control, there would have been no question of the right of the court to substitute the receiver of such corporation as a party defendant in place of such company, or if another corporation had succeeded to all of its rights and liabilities, to substitute such corporation as the party defendant.

The power of Congress to provide for a change of the party defendant ought to appear clear. Its authority to confer this power upon the President likewise ought to appear clear. That it did grant this power to the President can be drawn from the express and implied provisions of the Act of March 21, 1918. In the act it granted to him all necessary powers to make effective a Federal control and operation of railroads. Section 9 of the act in part states: "The President, in addition to the powers conferred by this act, shall have and is hereby given such other and further powers necessary or appropriate to give effect to the powers herein and heretofore conferred." [40 Stat. at L. 456, chap. 25, Comp. Stat. § 3115¾i, Fed. Stat. Anno. Supp. 1918, p. 762.]

It gave him power to appoint a Director General (§ 8).

This was not an improper delegation of power. (Rhodes v. Tatum, — Tex. Civ. App. —, 206 S. W. 114; Cocker v. New York, O. & W. R. Co. 253 Fed. 676; Wainwright v. Pennsylvania R. Co. 253 Fed. 459; Selective Draft Law Cases (Arver v. United States) 245 U. S. 366, 62 L. ed. 349, L.R.A. 1918C, 361, 38 Sup. Ct. Rep. 159, Ann. Cas. 1918B, 856, L.R.A. 1918E, 1015).

To these express powers should be applied, under elemental rules of construction, the implied powers (Dooley v. Pennsylvania R. Co. 250 Fed. 142, and Wilson v. Third Nat. Bank, 103 U. S. 770, 26 L. ed. 488, supra). The orders, therefore, of the Director General, when made, had the force and effect of law, the same as if made by Congress.

Viewing, therefore, the Federal control and operations of the transportation systems as a Federal instrumentality, it is apparent that Congress had the power to provide how and in what manner actions might be maintained concerning alleged breaches of contract or of legal duties arising or occurring during and on account of the Federal administration and operation of such transportation systems. No attempt has been made either by Congress or the Director General to change the cause of action. The Federal authority has simply provided against what representative of the Federal government the cause of action shall proceed. The majority opinion, in part, concedes that general orders 18 and 26 might be sustained because procedural. Clearly if these orders are valid, so likewise is general order No. 50. If the action were one against a state official as such, concerning his official duties, there would be no difficulty in appreciating the right of the court to substitute his successor, as the party defendant, upon his death, resignation, or lapse of office.

Furthermore, it is to be recognized that, regardless of whether Congress or the President possessed the authority to take over the Federal control of the common carriers, and operate and manage the same, the fact is that they did, and that they have operated and managed the same without any participation, control, or supervision by the corporations in the performance of the common-carrier duties theretofore performed by them. In consequence there is no cause of action alleged under the Federal Employers' Liability Act as against the defendant railway company.

But the majority opinion further contends that the trial court substituted the Director General as a party defendant without the consent of the plaintiff, and that the plaintiff had the right to have the court determine, as a judicial question, the liability or nonliability of the defendant railway company, and that the liability or nonliability of the defendant company is a judicial question, and not an administrative question to be determined by the Director General. True it may be that it is for the court to determine who is liable upon the alleged cause of action, in accordance with the law applicable thereto. On the other hand it is not the function of the courts to judicially legislate a defendant upon an alleged cause of action. Congress possessed the authority to legislate concerning the acts of negligence or breaches of duty or

obligation that might occur during the period of control. It did legislate. The majority opinion draws its conclusions from this legislation, and the powers exercised under it. The judicial question arises upon the interpretation of the nature and extent of this legislation and the powers so exercised.

Under fundamental rules of procedure, the trial court possesses the power to make the substitution as it did in this case and to dismiss the railway company as a party defendant. The trial court might have interpleaded the Director General upon principles of intervention. No objection, as heretofore stated, was made by the plaintiff to the action taken by the trial court. No claim was made by the plaintiff that the Director General ought to have been interpleaded and the railway company remain a party defendant. No attempt was made on the part of the plaintiff by amendment of the complaint, by affidavit, or showing of any kind, that there was a legal responsibility claimed against the railway company in the face of the undisputed motion and affidavit papers submitted by the defendant railway company. On the face of the record, therefore, in connection with the matters of which this court takes judicial notice, there existed before the court no cause of action alleged against the railway company. Under elemental rules, "no person is liable to be sued for any injuries for which he is not the cause," and "no person can be sued who has not infringed upon the right in respect of which the action is brought." Dicey, Parties to Actions, Rules 7 & 96; 30 Cyc. 102.

No objection having been made by the plaintiff, the trial court therefore did not err in substituting the Director General as the party defendant.

Again, the determination of this court turns upon the opinion of Justice Robinson, who concurs only in the result of the opinion as written by Justice Birdzell, and who, in the fashion of an *"ipse dixit,"* determines that the Director General was not made a dictator.

BRONSON, J. (addendum). Since the foregoing dissenting opinion was prepared, the majority opinion of this court, written by Justice Birdzell, has been changed somewhat. In this amended majority opinion the case of Schumacher v. Pennsylvania R. Co. 106 Misc.

564, 175 N. Y. Supp. 84, is quoted as direct authority for the conclusion reached in such majority opinion.

In a prior part of such majority opinion it is stated and held that Congress has said that suits may be brought against the carriers pursuant to § 10 of the Rail Control Act (as stated in the syllabus). Then the opinion quotes said New York case, holding such section to be unconstitutional and the statement of that court that plaintiff might have asked for the substitution of Director General, the action having been instituted prior to the promulgation of general order No. 50.

It is difficult indeed to understand the reasoning by which the majority opinion assumes that these holdings of that court are authority for the conclusion adopted by the majority in this case. The New York case directly states and holds that the plaintiff has no cause of action against the railway company upon acts or liabilities occurring during and on account of Federal control, and so necessarily it would hold in this case. It suggests to the plaintiff that he might have asked for substitution of the Director General, and if that officer should consent the plaintiff ought not to raise serious question. The court, in that case, suggests the very thing that was done in this case, with the consent of the railway company and the Director General, by the order of the court and without the objection of the plaintiff.

The majority opinion, therefore, is simply forced into the position of holding to a technical course of procedure, namely, that a party cannot be substituted in place of a party defendant, by order of court, unless the plaintiff so requests or consents thereto on the face of the record, even though such plaintiff has no cause of action on the face of the complaint against the defendant named, even though the Director General is the proper defendant, and even though, further, the plaintiff should have requested and asked for a substitution of such Director General. Through two courts already this action has dragged. Now, perchance, the action will proceed to demurrer or some other form of special motion and again proceed to this court for another construction, while the party plaintiff still awaits his ultimate remedy. The majority opinion practically concedes, by its suggestion to the appellant that a substitution ought to be had, the validity of general order No. 50. If it were a statutory rule of this state, such opinion would have

no difficulty in sustaining the substitution. Clearly it has this force and effect in this action brought under the Federal Employers' Liability Act. In our opinion, clearly, the order should be affirmed.