MARY C. SCHUMACHER, as Administratrix, etc., of PETER SCHUMACHER (Deceased), Plaintiff, *v.* THE PENNSYLVANIA RAILROAD COMPANY, Defendant.

(Supreme Court, Erie County, March, 1919.)

Constitutional law — violation of constitutional provision against taking of private property " without due process of law "— act of Congress, § 10, approved March 21, 1918.

Judgments — of court of competent jurisdiction — meaning of words " judgments rendered as now provided by law."

Trial — in action to recover damages — charge — new trial — railroads — carriers — verdict — judgments — appeal.

While section 10 of the act of Congress approved March 21, 1918, relating to and governing the operation of railroads taken over by the Federal government pursuant to lawful authority, provides that actions at law and suits in equity may be brought by and against carriers while under Federal control and " judgments rendered as now provided by law " it does not contemplate that all the property of such railroads should be taken over, nor does it forbid a judgment creditor of any such railroads from pursuing the usual remedies for the collection of his claim, saving from the particular property taken " under federal control;" nor does said statute prevent him from reaching other property of the carrier, of which judicial notice may be taken, for the satisfaction of judgments obtained pursuant to said section; yet, so far as it authorizes judgments against carriers for the defaults or liabilities of the government or its agents, it violates constitutional provisions against the taking of private property " without due process of law."

A judgment of a court of competent jurisdiction is not only a declaration of liability, but gives the right to resort to the usual and ordinary proceedings provided for its collection, and the words " judgments rendered as now provided by law," in said section 10, mean a judgment rendered in the usual way and negative the claim that such a judgment is merely a method of ascertaining the liability of the government which is in no sense the agent or representative of the companies to which the railroads taken over belong.

> At a time when the Federal government was operating defendant's railroad pursuant to the act of Congress approved August 29, 1916, and the proclamation of the president, December 26, 1917, plaintiff's intestate, who for many years had been employed by defendant as a yardmaster, was accidentally killed in one of its yards while in the discharge of his duties as yardmaster. In an action to recover damages predicated upon defendant's failure to properly inspect a freight car belonging to another railroad company, which had been received on defendant's line, the trial judge overruled defendant's objection that no recovery could be had against the defendant, and charged the jury to determine the question of liability, the same as though defendant, at the time of the accident, was in the possession of its road and engaged in its actual operation. *Held,* that while it would be logical to grant defendant's motion for a new trial after a verdict for plaintiff, the court, in order to obviate the necessity of a new trial, should formally deny the motion and order the exceptions taken on the trial, heard in the first instance at the Appellate Division, with a stay of the entry of judgment pending the disposition of the case on appeal, as should that court decide that section 10 of the act of Congress approved March 21, 1918, was constitutional, it can order the entry of judgment on the verdict.

MOTION by the defendant for a new trial after a verdict for the plaintiff.

Harold J. Adams, for motion.

Frank Gibbons, opposed.

WHEELER, J.   The plaintiff sued to recover damages for the death of her husband on the ground of the alleged negligence of the defendant.   The intestate had been for many years in the employ of the Pennsylvania Railroad Company prior to the time the operation of the company's road was taken over by the Federal government.   At the time of the accident resulting in his death he was yardmaster at the Gardenville yards of the defendant, just outside the city

of Buffalo. The plaintiff charges negligence. This issue was sharply litigated and was submitted to the jury for their determination. The jury rendered a substantial verdict for the plaintiff, thus establishing for the purposes of this case the allegation of negligence. It is unnecessary at this time to state fully all the circumstances of the accident. It is sufficient to say that the allegation of negligence was predicated on the claim of a failure to properly inspect a freight car belonging to another road, which had been received on the defendant's line. It was claimed the brake beam and its attachments were out of order, which resulted in the dropping of the brake beam and the consequent derailment of the car, which collided with a semaphore pole standing near the tracks. The collision broke the pole, which fell, striking and killing the plaintiff's intestate.

This accident occurred in May, 1918, at a time when the Federal government was operating the defendant's railroad pursuant to the act of Congress approved August 29, 1916, and the proclamation of the president of December 26, 1917. By its answer to the plaintiff's complaint the Pennsylvania Railroad Company, among other things, alleged that at the time of the accident its railroad had been taken over by the Federal government, and at the time was under its control and operation, and not that of the defendant, and that it is not legally responsible for the accident. Those facts were established upon the trial.

For the purposes of the trial the court overruled the objection that no recovery could be had against this defendant; and instructed the jury to determine the question of liability the same as though the defendant was, at the time of the accident, in possession of its road and engaged in its actual operation. The result was a verdict against the defendant, followed

by this motion for a new trial, with a stay of the entry of judgment pending the decision of the motion.

To sustain the right of recovery against the defendant, notwithstanding the defendant's railroad was being operated by the Federal authorities, the plaintiff stands upon the provisions of the act of Congress of March 21, 1918. The serious question involved is the constitutionality of that act in so far as it authorized the maintenance of actions and the recovery of judgments against carriers for damages sustained by employees and others while the railroad is being operated by and under the direction of the Federal authorities.

By an act of Congress approved August 29, 1916, Congress authorized the president, when the country is at war with another nation, to take over the operation of railroads in furtherance of the vigorous prosecution of the war. On December 26, 1917, in pursuance of the authority so given, the president assumed for the United States the management and control of the great transportation systems of the country, and issued his proclamation to that effect. Following this action by the president, Congress passed the act of March 21, 1918, entitled *"An Act for the operation of transportation systems while under Federal control, and for the compensation of their owners and for other purposes."* The first section of this act provides that " The President, having in time of war taken over the possession, use, control, and operation (called herein Federal control) of certain railroads and systems of transportation (called herein carriers), is hereby authorized to agree with and to guarantee to any such carrier * * * as just compensation an annual sum," etc. Then follow certain provisions touching the method of ascertaining the amount of compensation, for the payment of taxes, the mainte-

nance, repairs and renewal necessary in connection with the operation of the railroads.

Sections 2 and 3 of the act provide for the ascertaining of the compensation to be paid to the carriers, where the government and the carrier fail to reach an agreement as to compensation.

Section 8 declares that '' The President may execute any of the powers herein and heretofore granted him with relation to Federal control through such agencies as he may determine, and may fix the reasonable compensation for the performance of services in connection therewith,'' etc.

Section 12 declares '' moneys and other property derived * * * during Federal control are hereby declared to be the property of the United States. Unless otherwise directed by the President, such moneys shall not be covered into the Treasury, but such moneys and property shall remain in the custody of the same officers, and the accounting thereof shall be in the same manner and form as before Federal control,'' etc.

Section 10 of the act provides: '' Carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under State or Federal laws or at common law, except in so far as may be inconsistent with the provisions of this Act or any other Act applicable to such Federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal Government. Nor shall any such carrier be entitled to have transferred to a Federal court any action heretofore or hereafter insti-

tuted by or against it, which action was not so transferable prior to the Federal control of such carrier; and any action which has heretofore been so transferred because of such Federal control or of any Act of Congress or official order or proclamation relating thereto shall upon motion of either party be retransferred to the court in which it was originally instituted. But no process, mesne or final, shall be levied against any property under such Federal control."

The sections quoted are all the sections having any material bearing on the questions here involved. The act authorized the plaintiff to bring her action just as she did against the Pennsylvania Railroad Company, but the power of Congress to pass any such law is challenged. The constitutionality of the statute in so far as it authorizes a judgment against this defendant, and undertakes to make the company liable for the acts of the Federal authorities is questioned inasmuch as such a judgment, if enforced against the defendant, would amount to the taking of private property without due process of law. If the act in question had in terms provided that for the purpose of determining the liability, and ascertaining the damages, actions of this character might be instituted against the company carrier, but that when finally determined such judgments should not be satisfied out of property of the carrier, but paid by the United States, there probably could be no legitimate criticism of the act. In such a case the procedure would be simply a method of ascertaining the liability of the government and the amount of the incident damage without imposing any legal obligation on the carrier corporation. It is contended by the plaintiff that such, in substance, is the force and effect of the statute. Reliance is placed on that part of section 10 of the act providing that

" *no process, mesne or final, shall be levied against any property under such Federal control.*"

If *all* the property of a railroad company were in fact taken under Federal management and control it might be argued that such corporation would be fully protected by the clause quoted. We do not think the act of August 29, 1916, or that of March 21, 1918, contemplated that *all* the property of such corporations should be taken over by the Federal government. Indeed the very language of the clause seems to assume that the company may possess property other than such as is taken over by the government, for the exemption from levy and sale under execution is limited to " any *property under such Federal control* " and such only. Had Congress intended to exempt *all* the property of a carrier from levy and sale it would have so plainly said in the statute enacted. We may almost take judicial notice of the fact that railroad companies, or many of them, do own and possess other property than that employed in the transportation of passengers and freight. Many of them have large holdings of the stock and bonds of subsidiary companies. Many, if not all, in addition owned considerable sums of money on hand and in bank as the result of their operations. The Federal government took into its possession and control none of this class of property and all this class of property can be reached by judgment creditors in appropriate proceedings to satisfy valid judgments against the corporation.

Not only did the statute not authorize the government to assume control of the class of property referred to, but an examination of the president's proclamation of December 26, 1917, shows that as a matter of fact the government only assumed control and management of the physical properties of carriers used by them in their transportation systems. We

mention these facts for the purpose of showing that the protection against levy and sale under execution as to property *"under Federal control"* does not prevent the judgment creditor from reaching any other property owned by the carrier for the satisfaction of judgments obtained pursuant to the provisions of section 10. Nowhere in the statute are we able to find any provision forbidding the judgment creditor from pursuing the usual remedies for the collection of his claim, saving from the particular properties taken " under Federal control."

In time the various transportation systems taken over by the government will doubtless be returned to the various railroad companies which own them, and it is pertinent to ask whether unsatisfied judgments against carrier corporations might not be collected by execution against the property returned. Such property would then cease to be under " Federal control " and the prohibition against process against such property would cease to operate.

We are not without authority for the views we entertain. In the United States District Court for the Eastern District of South Carolina, the United States director of railroads sought to enjoin a sale under execution, under a judgment obtained against a railroad corporation, of certain lots owned by the company, and claimed not to have been taken over by the government. The court held that the acts of Congress of August 29, 1916, did not authorize the director general of railroads to take possession of lands belonging to a railroad company which are not used in the business as a carrier, and that a sale of such lands under execution will not be enjoined by the court. *United States Railroad Administrator* v. *Burch,* 254 Fed. Repr. 140.

Section 10 expressly authorizes *"judgments ren-*

*dered as now provided by law.''* If this language means anything it means a judgment having all the essential features of ordinary judgments obtained in the usual way, and negatives the claim that such a judgment is merely a method of ascertaining the liability of the government. A judgment of a court of competent jurisdiction is something more than a mere declaration of liability. It necessarily carries with it the right of satisfaction, the right to resort to the usual and ordinary proceedings provided for its collection. It directs and decrees that the successful party *'' recover ''* of the defeated party a sum stated and have execution therefor. Judgments not only establish a liability, but give the right to collect.

The Federal government, in the control and operation of the railroad properties taken over, is in no sense the agent or representative of the railroad companies to whom the systems belong. By the 12th section of the act the moneys and other property derived from the operation of the carriers during Federal control are *''declared to be the property of the United States.''* If a profit is realized from such operation the profit belongs to the United States. By section 8 the president is given power to exercise the powers granted him with relation to Federal control *''through such agencies as he may determine, and may fix the reasonable compensation for the performance of services in connection therewith.''* In other words, the Federal government in the operation of the systems taken over acts as the principal and not as the agent of the owners of the transportation system, becoming a lessee of the railroad on terms agreed upon between it and the companies. Where no agreements as to rentals are reached, and where no such formal leases are entered into the government is to pay such a rental as may be thereafter determined reasonable and just

by and in the methods prescribed. In short, the relation between the government and the carrier is nothing more or less than that of lessor and lessee, the lessee operating the road for itself and on its own account. The employees engaged in operating the various systems are, for the time being, at least, the government's servants and agents, subject to its directions, paid by the government, and subject to dismissal by it. This relation of the government and the carrier between themselves, and to their employees and to the general public, has been fully and repeatedly recognized by a series of orders issued by the director general of railroads under Federal control. We need but instance what is known as general order No. 8 by which the director general directs that all acts of Congress to promote the safety of employees and travelers must be complied with, and then proceeds in this language, " Now that the railroads are in the possession and control of the Government, it would be futile to impose fines for violations of said laws and orders upon the Government, therefore it will become the duty of the Director General in the enforcement of said laws and orders to impose punishments for willful and inexcusable violations thereof upon the person or persons responsible therefor, such punishment to be determined by the facts in each case."

If our view and construction of the statute in question is correct, we are face to face with the legal question whether, in so far as it authorizes actions and judgments against carriers for the negligence or default of the government or its agents, such provisions are constitutional and valid. To state the question is to answer it. We can reach no other conclusion than that in that respect Congress has exceeded its constitutional powers. It is repugnant to the great underlying principles of our jurisprudence, and vio-

lates, we think, the express provisions of the Fifth Amendment to the Federal Constitution declaring, " No person  *  *  *  shall be deprived of life, liberty or property, without due process of law, nor shall private property be taken for public use, without just compensation." Certainly the taking of the property of a corporation to pay the debt or liability of the government, for which the corporation is in no way responsible, violates this provision of the Constitution and deprives it of the equal protection of the law.

It probably was the intention of the framers of the statute that the government should ultimately pay all such demands as in justice and by right it should. It is impossible to believe that the contrary was in their minds, but the statute nowhere so provides. If the carrier were compelled to pay the judgment thus sought to be entered it would undoubtedly have a just demand against the government to be reimbursed for moneys so paid; but the fact that such a demand exists in no way cures the statute of the infirmity of unconstitutionality. The taking of the property of one to pay the debt of another is none the less illegal even though the party wronged may assert his right for compensation. The condemnation is against the illegal taking, and the violation of this constitutional guaranty is not cured by the possibility of future restitution.

It is urged by plaintiff's counsel that the United States, like every sovereign government, has the inherent power to take private property for public use (*United States* v. *Jones,* 109 U. S. 513), and that this right is not dependent upon any provision of the Constitution for its exercise (*Mississippi & R. R. Boom Co.* v. *Patterson,* 98 U. S. 406), and it is argued that the exercise of this right as provided by section 10 of the act of March 21, 1918, is simply an

exercise of such a power and cannot be questioned, particularly as it is in the nature of a war measure and in aid of a vigorous prosecution of the war. The act, however, under consideration goes further in that it provides, not for the taking of the defendant's property by the government itself, but by a third party to pay a government liability, the enforcement of a liability against a party in no way legally responsible for it. To carry the argument to its logical extent it might, with equal propriety, be urged that Congress had the right to authorize actions against private individuals for the payment of government bonds.

We can reach no other conclusion than that the act of March 21, 1918, in so far as it authorized judgments against carrier corporations for the default or liabilities of the government, violates the Federal Constitution providing against the taking of private property *"without due process of law."* It is difficult to formulate a comprehensive definition of the meaning of *due process of law* as used in the Federal and State Constitutions. Courts have been loath to frame such a definition. Judge Cooley in his work on Constitutional Limitations has said: " Nowhere has the correct view and principle been more accurately stated than in the opinion of Mr. Justice Johnson of the Supreme Court of the United States; 'As to the words from Magna Charta incorporated in the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to this, that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice.' " *Bank of Columbia* v. *Okely,* 4 Wheat. 235–244; Cooley Const. Lim. 505.

Judge Cooley further asserts: " There is no rule or principle known to our system under which private property can be taken from one person and transferred to another, for the private use and benefit of such other person, whether by general law or by special enactment." P. 507. See, also, *Levy* v. *Dunn,* 160 N. Y. 504; *Bertholf* v. *O'Reilly,* 74 id. 519.

That these principles are controlling it seems to us has been fully recognized by what is known as general order No. 50, issued October 28, 1918, by the director general of railroads under Federal control. This order recites the act of Congress approved March 21, 1918, and the acts of the president taking over the railroads of the country and the proceeds, that

" Whereas since the Director General assumed control of said systems of transportation, suits are being brought and judgments and decrees rendered against carrier corporations on matters based on causes of action arising during Federal control for which the said carrier corporations are not responsible, and it is right and proper that the actions, suits and proceedings hereinafter referred to based on causes of actions arising during or out of Federal control should be brought directly against the said Director General of Railroads and not against said corporations:

" It is therefore ordered, that actions at law  *  *  * based on  *  *  * claim for death or injury to person  *  *  * arising since December 31, 1917.  *  *  * which action, suit or proceeding but for Federal control might have been brought against the carrier company, shall be brought against William G. McAdoo, Director General of Railroads, and not otherwise."

The order further provides that in all actions of the same character already pending against the carrier company the pleadings may " *be amended by substi-*

*tuting the Director General of Railroads for the car-
rier company as party defendant and dismissing the
company therefrom."*

It is safe to assume that the director general of rail-
roads would not have issued the order in question
except upon the advice and after consultation with the
highest legal advisers of the government, and that it
was promulgated only after most careful and mature
consideration of the constitutional and legal questions
presented. We are safe, we think, in concluding that
the order represents the considerate judgment of the
government authorities on the questions we have been
considering in this opinion.

The questions here presented are not whether the
plaintiff has an adequate remedy for the death of her
husband, but whether her judgment should be one
against the Pennsylvania Railroad Company or against
the director general of railroads. Her action was
begun before order No. 50 was promulgated. Still she
might have asked for the substitution of the director
general as provided in the order. We are not pre-
pared to say that even at this date, after the trial and
a verdict, she might not amend by substituting the
director general. Certainly, if that official should con-
sent to such an order the plaintiff ought not to raise
serious objection. If he should decline to accede to
such a substitution and recognize the proceedings so
far had, then there would be all the more substantial
reasons why a judgment against the present defend-
ant should not stand.

We have reached the conclusions we have as to the
unconstitutionality of section 10 of the act of March
21, 1918, with much hesitation, being fully aware that
only the gravest reasons should exist for holding a
legislative act unconstitutional. We are not unmind-
ful of the far-reaching effect of such a holding. If a

37

different view were possible, the court would have been glad to have adopted it. The questions are of such a serious nature and so important that they should be passed on by courts of review. It would be the logical conclusion for the court to set aside the verdict, but the appellate courts have repeatedly expressed the opinion that constitutional questions should be reserved by trial courts for their determination, and in view of the situation we think the proper disposition should be that the motion for a new trial be formally denied, and the exceptions taken on the trial be ordered heard in the first instance at the Appellate Division of this court with a stay of the entry of judgment on the verdict pending the hearing and disposition of the case in that court. Such a course will obviate the necessity of a new trial. The damages have been ascertained and if the Appellate Division should entertain contrary views from those here expressed it can order the entry of judgment on the verdict.

The defendant, the Pennsylvania Railroad Company, has raised other questions on this motion which we have not discussed, but we are of the opinion that saving and excepting the constitutional question discussed, all must be resolved against the defendant.

An order may be entered in accordance with the views above expressed.

Ordered accordingly.

See *Rutherford* v. *Union Pacific R. Co.*, 254 Fed. Repr. 880; *Jensen* v. *Lehigh Valley R. Co.*, 255 id. 795.—[REPR.