## WESTERN UNION TELEGRAPH CO. v. WALLACE. (No. 7828.)

(Court of Civil Appeals of Texas. Galveston. Feb. 10, 1920. Rehearing Denied Oct. 13, 1921.)

**1. Telegraphs and telephones ☞26¾, New, vol. 7A Key-No. Series—Not liable for negligence during federal control.**

A telegraph company is not liable for the negligence of agents during federal control, regardless of whether the person injured has a remedy against the government.

**2. Telegraphs and telephones ☞26¾, New, vol. 7A Key-No. Series—Federal control shown.**

The joint resolution of Congress of July 16, 1918 (U. S. Comp. St. Ann. Supp. 1919, § 3115¾x), the President's proclamation of July 22, the order of the Postmaster General of August 1, 1918, and his General Orders Nos. 2067 and 3380, relating to government control of the telegraphs and telephones show conclusively that the government was in control of a system and operating it through the former agents and employees of the companies in October, 1918, when plaintiff claimed to have been injured by negligent delay in delivering a message.

**3. Evidence ☞34, 46—Resolution of Congress and proclamation taking control of telegraphic systems judicially noticed.**

The court takes judicial knowledge of the joint resolution of Congress (U. S. Comp. St. Ann. Supp. 1919, § 3115¾x), and of the proclamations of the President and of the Postmaster General thereunder taking control of telegraph and telephone systems of the country.

Appeal from District Court, Colorado County; M. Kennon, Judge.

Action by K. L. Wallace, as next friend of C. L. Wallace, against the Western Union Telegraph Company. Judgment for the plaintiff, and defendant appeals. Reversed, and judgment rendered for defendant.

Francis R. Stark, of New York City, Thompson, Barwise, Wharton & Hiner, of Fort Worth, and Hume & Hume, of Houston, for appellant.

W. L. Adkins, of Columbus, for appellee.

LANE, J. This suit was brought by K. L. Wallace, as next friend of his minor son, C. L. Wallace, against the Western Union Telegraph Company, to recover for mental pain and anguish. And for cause of action he alleged the negligent delay in the transmission and delivery of two certain telegraphic messages sent by K. L. Wallace, over the line of appellant on the 20 and 21st days of October, 1918, addressed to his minor son, C. L. Wallace at San Antonio, Tex., announcing the serious illness of his wife, the mother of the son, and that by reason of the negligence complained of C. L. Wallace failed to see his mother while she was conscious, thereby causing the said C. L. Wallace to suffer mental pain and anguish to his damage in the sum of $1,950 for which he prays judgment.

Appellant answered by a general demurrer, denied generally, and specially alleged that at the time the messages in question were sent and at the time the contracts for transmission were entered into in regard to them the telegraph system owned or formerly owned and operated by appellant was under the control of and being operated by the government of the United States, through and under the direction of the Postmaster General of said government, and therefore appellant was not and could not be held liable for the wrong alleged to have been suffered by appellee. Appellant further alleged the passage of the joint resolution by the Congress of the United States on the 16th day of July, 1918 (U. S. Comp. St. Ann. Supp. 1919, § 3115¾x), authorizing the President of the United States to supervise, take possession of, and assume control of the telegraph systems in the United States, or any part of such systems, and to operate same in the interest of the government of the United States. It alleged further that by virtue of said joint resolution the President issued his proclamation placing said telegraph systems, including appellant's under the supervision, possession, and control of Postmaster General Albert S. Burleson, and that by virtue of said proclamation the said Burleson had lawfully taken possession of and was controlling and operating said systems at the time said messages were sent by the said K. L. Wallace, and it says that for the reasons alleged the plaintiff was not entitled to recover from it for the damages alleged to have been suffered by him.

The cause was tried before the court without a jury. The court overruled the general demurrer of the defendant and upon the facts rendered judgment for appellee Wallace against appellant for the sum of $1,000.

We think the main and controlling question, if not the only one, presented by this appeal for our determination, is presented by appellant in its second assignment. By that assignment it is in substance insisted that the judgment rendered is contrary to the law and all the evidence, in that the undisputed evidence conclusively shows that the telegraph system of appellant, which was formerly in its possession and control, and which was formerly operated by it, was taken from it by the government of the United States prior to the time the contract for the transmission and delivery of the telegraph messages in question were made, and that it was excluded by said government from

the use and operation thereof from such date, up to the date of filing its answer in this cause, and that ever since its properties were so taken from it up to the date of filing its said answer the government of the United States has been in possession thereof, controlling and operating the same through and under the direction of the Postmaster General of the United States, *through the former officers, agents, and employés of appellant,* and that all the revenues derived from such operation belonged to and were being held by such officers, agents, and employés subject to the orders of the Postmaster General, and therefore no right of action in favor of the appellee existed against appellant by reason of the wrongs complained of by appellee. (Italics ours.)

If appellant's conclusion of the effect of the evidence, as stated in the assignment is correct, there is but one answer to be made, and that answer is that no cause of action whatever was shown against appellant, and as a consequence the judgment rendered against appellant was without evidence to support it, and therefore it should be reversed, and judgment here rendered for appellant.

[1] It can hardly be seriously contended that, if the government of the United States, either by lawful means or by force, dispossessed appellant of its telegraphic system and operated the same through and under the direction of the officers, agents, and employés of the government, appellant could be held liable for any wrongful act of the government whereby another suffered injury. This is true regardless of whether or not appellee has a remedy for the wrongs committed by the government resulting in injury to him. Schumacher v. Railway Co., 106 Misc. Rep. 564, 175 N. Y. Supp. 84; Edwards v. Jones, 12 Daly (N. Y.) 415. By what source of reasoning can it be held that appellant can be held liable for the acts of the government over which it had no control whatever? Can it be thought that, where one person takes property of another, without his consent, and against his protest, and thereafter wrongfully uses the same so as to bring about damage to a third person, such third person can recover against the owner such damages so suffered solely because such third person has no remedy against the wrongdoer?

[2, 3] The important inquiry therefore is: Does the undisputed evidence show that at the time the messages were sent the government of the United States had taken possession of appellant's telegraph system, and that it was controlling and operating the same, as contended by appellant?

It is shown that on the 16th day of July, 1918, the Congress of the United States passed a joint resolution authorizing the President to take possession and assume con-trol of any telegraph systems in the United States and to operate same in such manner as may be needful or desirable for the duration of the war, and to provide just compensation therefor, and that on the 22d day of July, 1918, President Wilson, after first proclaiming the fact that Congress had authorized him to take possession and control of the telegraph systems of the country and to operate them, further proclaimed as follows:

"Now, therefore, I, Woodrow Wilson, President of the United States, under and by virtue of the powers vested in me by the foregoing resolution, and by virtue of all other powers thereto me enabling, do hereby take possession and assume control and supervision of each 'and every telegraph and telephone system, and every part thereof, within the jurisdiction of the United States, including all equipment thereof and appurtenances thereto whatsoever, and all materials and supplies.

"It is hereby directed that the supervision, possession, control, and operation of such telegraph and telephone systems hereby by me undertaken shall be exercised by and through the Postmaster General, Albert S. Burleson. Said Postmaster General may perform the duties hereby and hereunder imposed upon him so long and to such extent and in such manner as he shall determine, *through the owners, managers, boards of directors, receivers, officers, and employés of said telegraph and telephone systems.* [Italics ours.]

"Until and except so far as said Postmaster General shall from time to time by general or special orders otherwise provide, the owners, managers, boards of directors, receivers, officers, and employés of the various telegraph and telephone systems shall continue the operation thereof in the usual and ordinary course of the business of said systems, in the names of their respective companies, associations, organizations, owners, or managers, as the case may be.

"Regular dividends hitherto declared and maturing interest upon bonds, debentures, and other obligations, may be paid in due course; and such regular dividends and interest may continue to be paid until and unless the said Postmaster General shall, from time to time, otherwise, by general or special orders, determine; and, subject to the approval of the Postmaster General, the various telegraph and telephone systems may determine upon and arrange for the renewal and extension of maturing obligations.

"By subsequent order of said Postmaster General supervision, possession, control, or operation may be relinquished in whole or in part to the owners thereof of any telegraph or telephone system or any part thereof supervision, possession, control, or operation of which is hereby assumed or which may be subsequently assumed in whole or in part hereunder.

"From after 12 o'clock midnight on the 31st day of July, 1918, all telegraph and telephone systems included in this order and proclamation shall conclusively be deemed within the possession and control and under the supervision of said Postmaster General without further act or notice.

"Done by the President in the District of Columbia this 22d day of July, in the year of our Lord one thousand nine hundred and eight-

een, and of the independence of the United States one hundred and forty-third.

"Woodrow Wilson."

—and that on the 1st day of August, 1918, Postmaster General Albert S. Burleson issued the following order:

"Washington, August 1, 1918.

"Pursuant to the Proclamation of the President of the United States, I have assumed possession, control, and supervision of the telegraph and telephone systems of the United States. This proclamation has already been published, and the officers, operators, and employés of the various telegraph and telephone companies are acquainted with its terms.

"Until further notice the telegraph and telephone companies shall continue operation in the ordinary course of business through regular channels. Regular dividends heretofore declared and maturing interest on bonds, debentures, and other obligations may be paid in due course, and the companies may renew or extend their maturing obligations unless otherwise ordered by the Postmaster General. All officers, operators, and employés of the telegraph and telephone companies will continue in the performance of their present duties, reporting to the same officers as heretofore, and on the same terms of employment. Should any officer, operator, or employé desire to leave the service, he should give notice as heretofore to the proper officer, so that there may be no interruption or impairment of the service to the public.

"I earnestly request the loyal co-operation of all officers, operators, and employés and the public, in order that the service rendered shall not only be maintained at a high standard, but improved wherever possible. *It is the purpose to co-ordinate and unify these services so that they may be operated as a national system,* with due regard to the interests of the public and the owners of the properties.

"No change will be made until after the most careful consideration of all the facts. When deemed advisable to make changes, due announcement will be made.

[Italics ours.]

"A. S. Burleson, Postmaster General."

From the facts recited it is made apparent: First, that Congress empowered the President to take possession and control of and to operate the telegraph systems of the country; second, that, acting under such powers granted by Congress, the President directed that each and every telegraph system within the jurisdiction of the United States, including all equipment thereof and appurtenances thereto whatsoever, and all materials and supplies, should be taken over by the government, and that the "supervision, possession, control, and operation of such telegraph systems" undertaken by the President shall be exercised by and through the Postmaster General, Albert S. Burleson, and that said Postmaster General might perform the dutes imposed upon him (if he saw proper) "through the owners, managers, board of directors, receivers, officers, and employés of said telegraph systems." We have

reached the conclusion that it has been conclusively shown by the evidence that this act of Congress, the proclamation of the President of the United States, and the orders of the Postmaster General, of all of which this court takes judicial knowledge, that at the time the messages were sent the telegraph system of appellant was in the possession of and being operated by the United States government, through the former officers, managers, and employés of appellant, who were retained by the government as its employés, and who were at the time such messages were sent the agents and employés of the government, and who were at that time being directed and controlled by the Postmaster General. We think that it has been made clear from what has been said that in carrying out the authority exerted by the proclamations of the President and Postmaster General the telegraph system of appellant passed into the possession, control, and operation of the United States through the Postmaster General on the 1st day of August, 1918, more than two months before the messages in question were sent, and that such operation continued until the end of the war. We do not think any further elaboration could make clearer than do the act of Congress of July 16, 1918, the proclamation of the President exerting the powers given and the orders and acts of the Postmaster General dealing with the situation created by the exercise of authority given him by the proclamation of the President that no divided, but a complete, possession and control of the telegraph system in question were given the United States.

In the case of Dakota Cent. Tel. Co. v. State of South Dakota, 250 U. S. 163, 39 Sup. Ct. 507, 63 L. Ed. 910, 4 A. L. R. 1623, decided by the Supreme Court of the United States June 2, 1919, a case involving similar questions to those of this case, the court said:

"We must dispose of the issues thus insisted upon before testing the soundness of the interpretation of the statute upon which the court below acted, and for the purpose of considering them as well as the question of construction which the court below expressly decided we state the case.

"On the 16th day of July, 1918, Congress adopted a joint resolution (40 Stat. 904, c. 154 [Comp. St. 1918, § 3115¾x, appendix]) providing: 'That the President during the continuance of the present war is authorized and empowered, whenever he shall deem it necessary for the national security or defense, to supervise or to take possession and assume control of any telegraph, telephone, marine cable, or radio system or systems, or any part thereof, and to operate the same in such manner as may be needful or desirable for the duration of the war, which supervision, possession, control, or operation shall not extend beyond the date of the proclamation by the President of the exchange of ratifications of the treaty of peace: Provided, that just compensation shall

be made for such supervision, possession, control, or operation, to be determined by the President: * * * Provided further, that nothing in this act shall be construed to amend, repeal, impair, or affect existing laws or powers of the states in relation to the taxation or the lawful police regulations of the several states, except wherein such laws, powers, or regulations may affect the transmission of government communications, or the issue of stocks and bonds by such system or systems.'

"Six days thereafter, on the 22d of July, the President exerted the power thus given. Its exercise was manifested by a proclamation which, after reciting the resolution of Congress, declared:

"'It is deemed necessary for the national security and defense to supervise and take possession and assume control of all telegraph and telephone systems and to operate the same in such manner as may be needful or desirable.

"'Now, therefore, I Woodrow Wilson, President of the United States, under and by virtue of the powers vested in me by the foregoing resolution, and by virtue of all other powers thereto me enabling, do hereby take possession and assume control and supervision of each and every telegraph and telephone system, and every part thereof, within the jurisdiction of the United States, including all equipment thereof and appurtenances thereto whatsoever, and all materials and supplies.

"'It is hereby directed that the supervision, possession, control, and operation of such telegraph and telephone systems hereby by me undertaken shall be exercised by and through the Postmaster General. * * *'

"The proclamation gave to the Postmaster General plenary power to exert his authority to the extent he might deem desirable through the existing owners, managers, directors, or officers of the telegraph or telephone lines, and *it was provided that their services might continue as permitted by general or special orders of the Postmaster General.* It was declared that: 'From and after 12 o'clock midnight on the 31st day of July, 1918, all telegraph and telephone systems included in this order and proclamation shall conclusively be deemed within the possession and control and under the supervision of said Postmaster General without further act or notice.'

"Under this authority the Postmaster General assumed possession and control of the telephone lines and operated the same. On the 31st day of October, 1918, the President, through the Postmaster General, in the exertion of the duty imposed upon him by the resolution of Congress to make compensation, concluded a contract with the telephone companies of the most comprehensive character covering the whole field while the possession, control, and operation by the United States continued. By its terms stipulated amounts were to be paid as consideration for the possession, control, and operation by the United States, and the earnings resulting from such operation became the property of the United States. *Although concluded in October, 1918, by stipulation the contract related back to the time when the President took over the property.*" (Italics ours.)

We cite Northern Pac. Ry. Co. v. State of North Dakota, 250 U. S. 135, 39 Sup. Ct. 502,

63 L. Ed. 897, decided by the Supreme Court of the United States on the 2d day of June, 1919, and Rutherford v. Union Pac. Ry. Co. (D. C.) 254 Fed. 880, as announcing the same rules as those announced in the case above quoted from, except that the cases last cited were cases in which railway companies were sued, respecting which it is specially provided by the act of Congress placing railroads in the possession and control of the government that suits may be brought against the Director General for wrongs committed by the employés of the government in the operation of such railroads. In so far as these cases decide the question of liability of the owners of railroads, they are applicable to the present case. We also quote, as applicable to the present case, from the following cases:

Haubert v. Baltimore & Ohio Ry. Co. (D. C.) 259 Fed. 361:

"Manifestly it seems to me that in view of these conditions no liability exists against the railroad company itself for a personal injury due to operation under federal control, and that no judgment can be rendered therefor which will become a lien upon the corpus of its property or payment compelled therefrom. If this were done, the result would be that one person's property would be taken without his consent and without compensation to pay the debt of another."

Hatcher & Snyder v. A., T. & S. F. Ry. Co. (D. C.) 258 Fed. 952:

"Where the federal government has taken over the entire operation of a railroad under Act Aug. 29, 1916, * * * and Act March 21, 1918, so as to exclude the company from active management, the company cannot be made liable for negligence or injuries to shipments. * * *"

Mardis v. Hines (D. C.) 258 Fed. 945:

"From the time that the proclamation of the President became effective on December 28, 1917, the Director General, as the representative of the President, has been in the exclusive possession and control of the railroad. The railroad company exercises no control whatever. The railroad is operated under the orders of the Director General. The railroad company has nothing to do with such operation. When the Director General assumed control all the employés on the railroad ceased to be employés of the railroad company and became employés of the Director General. At that time the relation of master and servant ceased to exist between the employés operating the railroad and the railroad company. That relation then began and still exists between such employés and the Director General."

See, also, Brady v. Ry. Co., 114 Fed. 100–107, 52 C. C. A. 48, 57 L. R. A. 712.

In view of the fact that appellee makes the contention that the possession, control, and operation of the telegraph system of appellant did not pass from it to the government until after the messages in question were

sent, we deem it advisable to set out a copy of Orders Nos. 2067 and 3380 of the Postmaster General, which we think show clearly that he construed his order of August 1, 1918, as a taking possession and control of the telegraph systems of the country at that time.

Order No. 2067 reads as follows:

"To All Telegraph and Telephone Companies: Information has reached this department that representations are being made throughout the country that it is the desire of the government that employés of the telegraph and telephone companies should join the Commercial Telegraphers' Union, the International Brotherhood of Electric Workers, or other unions. These representations have no foundation in fact whatever. In its operation of the telegraph and telephone systems the Post Office Department will not distinguish between nonunion and union employés. Persons will be employed solely because of their fitness for the position to which they seek employment, and must not be employed, discharged, favored, or discriminated against because they do or do not belong to any particular organization. Officers and employés of the telegraph and telephone systems will comply strictly with the provisions of this order."

Order No. 3380 reads as follows.

"All such telegraph and telephone companies are hereby directed to close their books as of midnight July 31, 1919, and to proceed promptly to collect all outstanding indebtedness and accounts arising out of the operation of such systems during the period of government control, and at the earliest practical time to submit a full account to Wm. H. Lamar, Chairman of the Finance Committee, Wire Control Board."

Having reached the conclusion that no liability is shown against appellant, the judgment of the trial court is reversed, and judgment is here rendered for appellant.

Reversed and rendered.