(89 South. 191)

## LOUISVILLE & N. R. CO. v. HEIDTMUELLER. (6 Div. 953.)

(Supreme Court of Alabama. Jan. 13, 1921. Rehearing Denied May 6, 1921.)

**1. Railroads ☞391(3)—Wanton injury to persons on tracks defined.**

The rule that trainmen are guilty of wantonness for running at a great speed without lookout, signal, or warning at points densely populated, and where people frequently and regularly pass over the track, notwithstanding they may be trespassers, applies to rural communities as well as cities, towns, or villages, but such use of the roadbed must be by such large numbers and of such frequency and regularity that trainmen will be held to a knowledge of a probable consequence of not complying with the precaution.

**2. Railroads ☞400(15)—Evidence of wanton injury to child held insufficient to go to jury.**

In an action for the wanton death of a child on a track used by children as a passageway to school, evidence *held* insufficient to show that the engineer knew or could have reasonably apprehended that children were likely to pass over the track at the time of the injury, so that an affirmative charge should have been given as requested by the defendants.

Brown, J., dissenting.

Appeal from Circuit Court, Cullman County; O. Kyle, Judge.

Action by Eddie Heidtmueller, as administrator of the estate of Theodore Heidtmueller, against the Louisville & Nashville Railroad Company, for damages for the death of his intestate. Judgment for the plaintiff, and defendant appeals. Reversed and remanded.

The case was originally brought in three counts, but counts 1 and 3 were eliminated, and count 2, which charged wantonness to the engineer of the defendant, one J. D. Jessie, who was then and there acting within the line and scope of his employment. The evidence tended to show that at the point where the child was killed, and within a mile thereof, there were perhaps 30 houses, and that this part of the track was used by children going and returning from school. At the conclusion of the evidence the defendant requested the affirmative charge, which was refused.

Eyster & Eyster, of Albany, and A. A. Griffith, of Cullman, for appellant.

The count as amended was subject to the demurrers. 179 Ala. 304, 60 South. 927; 164 Ala. 67, 51 South. 345; 10 Allen (Mass.) 368, 87 Am. Dec. 644. Under the facts in this case, defendant was entitled to a directed verdict. 190 Ala. 117, 66 South. 799; 116 Ala. 540, 22 South. 976; 179 Ala. 311, 60 South. 927; 130 Ga. 675, 61 S. E. 539; 190 Mo. 228, 88 S. W. 608; 54 Tex. Civ. App. 399, 117 S. W. 488; 111 Fed. 586, 49 C. C. A. 474, 55 L. R. A. 363; 143 Ala. 217, 38 South. 1013; 134 Ind. 269, 33 N. E. 1029, 39 Am. St. Rep. 261; 171 Ala. 255, 55 South. 170; 197 Ala. 512, 73 South. 103; 6 Ala. App. 664. 60 South. 979; 191 Ala. 499, 67 South. 675; 9 Ala. App. 530, 63 South. 768; 9 Ala. 408; 126 Ala. 95, 27 South. 760; 87 Ala. 277, 6 South. 291.

W. A. Denson, of Birmingham, and Paine Denson, of Cullman, for appellee.

There was no error in overruling demurrers to the complaint. 11 Cooley's Blackstone, 76; 1 Chitty on Pleading, 262; 170 Ala. 570, 54 South. 184. There was no error in the charges of the court. 148 Ala. 76, 41 South. 616; 119 Ala. 563, 25 South. 251, 72 Am. St. Rep. 943; 121 Ala. 504, 26 South. 35; 103 Ala. 170, 15 South. 511, 49 Am. St. Rep. 21; 99 Ala. 408, 13 South. 75; 144 Ala. 381, 39 South. 654; 194 Ala. 34, 69 South. 551; 199 Ala. 571, 75 South. 163.

ANDERSON, C. J. [1] It is the well-established law in this state that trainmen will be guilty of wantonness for running their trains at a great rate of speed without lookout, signal or warning at points densely populated, and where people constantly, frequently, and with regularity pass on or over the track, notwithstanding those who pass on or along same may be trespassers, and this rule applies to rural communities, as well as cities, towns, or villages. Whitehead v. St. Louis R. R. Co., 179 Ala. 314, 60 South. 930; Haley v. K. C. R. R. Co., 113 Ala. 640, 21 South. 357. Nor do we think that this rule is opposed by the case of South. R. R. Co. v. Stewart, 179 Ala. 304, 60 South. 927, notwithstanding the expression that the use must not only be frequent, and by a large number of people, "and must coexist with the proximity of a populous city or village," which said quoted expression was not decisive of the case, and it is not altogether accurate. Density, however, of the population alone will not suffice, as there must also be a use of the roadbed by the public in such large numbers and with such frequency and regularity that the trainmen will be held to a knowledge of the probable consequences for the noncompliance with the aforesaid precautions. Highland Ave. R. R. v. Robbins, 124 Ala. 113, 27 South. 422, 82 Am. St. Rep. 153.

[2] While the evidence in this case shows that the settlement attingent to the point where the child was killed is perhaps a little more populous than the community dealt with in the Whitehead Case, supra, and that those who resided there used the defendant's track in going to and returning from Vinemont and other points, it does not show that the same was used by such numbers and with such frequency and regularity as to render it a place where the trainmen would be charged with a consciousness that the nonobservance of the cautionary measures above mentioned would probably produce death or injury. Some of the questions propounded to some of the witnesses would render an affirmative answer some proof of this fact if said general affirmative answer stood alone, as the questions were so framed as to make it a generally used thoroughfare at the time this child was run over; and some of the witnesses answered affirmatively, but later on demonstrated that they did not know the exact hour when the train passed this particular point, or that, in testifying to the use of the track at or near this time, they had reference to the use of the same by the children in returning from school.

Indeed, the plaintiff seems to have appreciated the fact that the general or ordinary use by the public at this point did not afford a basis for wantonness on the part of the enginemen, except, perhaps, at or during certain hours of the day. In other words, it was proven that from 20 to 27 children used the track at this point as a passageway in going to and returning from school, which was about a mile north. There was a double track at this point, and some of the evidence shows that they walked between the two tracks, while some shows that they went between the rails of the track over which train No. 2 ran on the day in question. The evidence shows that school opened at 8:30 a. m., and closed at 4 p. m. Therefore, we may concede that there was such a use of the track for a certain period of the day just before 8:30 a. m. and just after 4 p. m. as to charge an engineer, familiar with conditions at this point at that time, with the probable consequences of not observing cautionary measures when passing; yet there is not a particle of evidence that shows, or from which the jury could have reasonably inferred, that this engineer, Jessie, knew or could have reasonably apprehended that children would be at this point at the time his train No. 2 passed on the day that the child was killed.

The evidence shows that school turned out at 4 p. m., and, as it would naturally take the children some time to reach this point, they could not have gotten there until some minutes after 4. True, some of the evidence shows that some of the younger ones got out

earlier, but just how many, or when they reached the point in question, the evidence does not disclose with any degree of accuracy or certainty. The schedule time of No. 2 was 2:20 o'clock, and the trial judge in the oral charge stated that the "undisputed" evidence showed that on the day the accident occurred it passed there at "3:14 o'clock in the afternoon." We think the great weight of the evidence convincingly shows that the train passed at 3:14, and not later, though there was one witness for the plaintiff who said it was as late as 3:40 or 3:45. Therefore, assuming that this train passed between 3:14 and 3:45, it was before school dispersed, and before the children were in the habit of reaching this point when returning to their respective homes, unless it may have been some of the smaller ones; but as to the number and the exact hour at which they usually arrived we are not informed. At any rate, there is no satisfactory proof that the point of the accident was frequented by school children between 3:14 and 3:45 in the afternoon; but, if the evidence did show this fact, there is nothing whatever to show that this engineer, Jessie, was ever along there at this particular hour on former runs, or had the slightest knowledge that the track was a passageway for children generally, and with frequency between 3:14 and 3:45 in the afternoon.

There was some evidence that several times prior to the accident train No. 2 was late, but just the exact time of its passage is not fixed, except one witness attempts to fix it at times when the school children were returning, and by general answer to counsel's question attempts to fix it corresponding with the time when the accident occurred. The extent to which the witness would go, however, as to when the train was late was, "it is near the time for the school children to come." This witness further stated, "I was not there, and did not know whether the school children were on the track or not; I have never seen them." There was also proof that train No. 2 had been seen to pass between 3 and 4 in the afternoon, but just when or how often the proof does not show.

On the other hand, the defendant's undisputed evidence shows that Jessie had been running on No. 2 for only about a month, and only once a week, going north; that is, each Monday. Therefore this engineer, Jessie, had never passed this point on No. 2 going north exceeding four times prior to the accident, and the proof does not show that on either of these trips he ever passed at the same hour in question, or when the children were or would probably be upon the track. The runs he made on trains just prior to going on No. 2 did not pass at such times when the children were using the track. Prior to this he ran on a freight train for about a year, due at Vinemont, going south, about daylight, and about 4:30 in the afternoon going north.

Therefore, conceding that he could and did see children returning from school on these north-bound trips at 4:30 in the afternoon, this not only failed to put him on notice that they would be at this point from 3:14 to 3:45, but, in effect, assured him that school did not close until later, and that they would not come along until after 4 o'clock. The evidence in this case utterly fails to charge this engineer with the knowledge of such dangerous conditions at the point in question as to render him guilty of the wanton death of this child upon this afternoon in question. The fact that he was conscious that persons would, at the time he passed, probably be upon or within dangerous proximity of the tracks is not borne out by the evidence or the reasonable inferences to be drawn therefrom, as distinguished from mere conjecture or speculation. We consequently hold that the trial court erred in not giving the affirmative charge as requested by the defendant, and the judgment of the circuit court is reversed and the cause is remanded.

While we treat this case upon the asumption that this child was killed by train No. 2, and while using its track as a walk or passageway, we do not wish to be understood to hold that the evidence is sufficient to reasonably establish the fact that the child was killed while using the track in the ordinary way, on which the plaintiff relies to establish such a general and customary use as to charge this defendant with wantonness on the part of its agents or servants. Southern R. R. Co. v. Stewart, supra, and cases therein cited.

The judgment of the circuit court is reversed and the cause is remanded.

Reversed and remanded.

All the Justices concur, except BROWN, J., who dissents.

THOMAS, J. (concurring). In addition to what the Chief Justice has written, I concur in the reversal of the cause for reasons set forth in my concurring opinion in Crim, Admrx., v. L. & N. R. R. Co., 89 South. 376.[1] In addition to the authorities there collected I wish to add the following: Northern Pac. Ry. Co. v. North Dakota, 250 U. S. 135, 39 Sup. Ct. 502, 63 L. Ed. 897; Hatcher v. Atchison, etc., Co. (D. C.) 258 Fed. 952; Bloch v. United States (C. C. A.) 261 Fed. 321; Krichman v. United States (C. C. A.) 263 Fed. 538; Erie R. Co. v. Caldwell (C. C. A.) 264 Fed. 947; Blevins v. Hines, Dir. Gen. (D. C.) 264 Fed. 1005; Schumacher v. Penn. R. Co., 106 Misc. Rep. 564, 175 N. Y. Supp. 84; Mitchell v. Cumberland T. & T. Co., 188 Ky. 263, 221 S. W. 547, 10 A. L. R. 946; McGrath v. Northern Pac. Ry. Co. (N. D.) 177 N. W. 383; Groves v.

[1] Post, p. 110.

Grand Trunk W. Ry. Co., 210 Mich. 409, 178 N. W. 232; Peacock v. Detroit, G. H. & M. Ry. Co., 208 Mich. 403, 175 N. W. 580, 8 A. L. R. 964; Cravens v. Hines, Dir. Gen. (Mo. App.) 218 S. W. 912; Galveston, H. & S. A. Ry. Co. v. Wurzbach (Tex. Civ. App.) 219 S. W. 252; Bolton v. Hines, 143 Ark. 601, 221 S. W. 459; Commonwealth v. L. & N. R. R. Co., 189 Ky. 309, 224 S. W. 847, 11 A. L. R. 1446—to the effect that recovery cannot be had against a corporation whose transportation properties were being operated by the government, by operation of law, for torts committed by agents of the Director General or federal agent of the United States in such operation.

BROWN, J. (dissenting). This case was submitted to the jury under count A charging wantonness on the part of the defendant Jessie, the engineer in charge of and operating the locomotive pulling the defendant's train.

The evidence shows that the mangled body of plaintiff's intestate, a child of 10 years, was found between the rails of the track over which the defendant operated its north-bound passenger trains, an hour or so after train No. 2, fast mail operating between New Orleans and Cincinnati, passed this point. There was physical evidence on the rails tending to show that the child was struck at a point 363 feet south of the point where the body was found—such place being in a cut and on a curve—and the evidence shows that the train passed this point some time between 3 and 4 o'clock p. m. Plaintiff's evidence tends to show that the train passed this point about 3:45 p. m., while defendant's evidence tends to show that the train reached and passed Vinemont, a mile and a half north of the place where the body was found, at 3:14 p. m.

The evidence further shows that train No. 2 met and passed a freight train, moving southward, on the west track, at or near the point where the body was found; and that the north bound passenger train, with the defendant Jessie in charge of the locomotive, as it approached and passed this point was running from 35 to 40 miles per hour, and that the enginemen were not keeping a lookout at the time, and did not discover the plaintiff's intestate on the track, and that the train approached without giving any signals of warning of its approach, other than the noise incident to its operation. The place where the body was found was one and a half miles south of Vinemont, and from three to four miles north of Cullman.

In Southern Ry. v. Stewart, it was held that the doctrine of M. & C. R. R. Co. v. Womack, 84 Ala. 149, 4 South. 618, and Glass v. M. & C. R. R. Co., 94 Ala. 581, 10 South. 215, that a—

"Trespasser can recover only for wanton or intentional injury by railroad's servants; and this wantonness, or intention * * * can never be imputed to him [them] unless they actually know—not merely ought to have known —the perilous position of the person on the tracks, and with such knowledge, failed to resort to every reasonable effort to avert the injury"

—must now be regarded as qualified by the later decisions of this court, applying the rule of the Lee Case, 92 Ala. 271, 9 South. 230, to trespassers walking along the track or right of way, where the use of the track has been long continued, and with such frequency as to impute notice of such use to the employés of the railroad operating trains over such place. Southern Ry. Co. v. Stewart, 179 Ala. 304, 60 South. 927; Haley v. K. C. M. & B. R. R. Co., 113 Ala. 640, 21 South. 357; A. G. S. R. R. Co. v. Guest, 136 Ala. 348, 34 South. 968; Id., 144 Ala. 373, 39 South. 654; North Ala. R. R. Co. v. Counts, 166 Ala. 550, 51 South. 938.

So it must now be regarded as settled that the rule announced in Lee's Case, to wit:

"To run a train at a high rate of speed, and without signal of approach at a point where the trainmen have reason to believe there are persons in an exposed position on the track, as over an unguarded crossing in a populous district of a city, or where the public are wont to pass on the track with such frequency and in such numbers—facts known to those in charge of the train—as that they will be held to a knowledge of the probable consequences of maintaining great speed without warnings, so as to impute to them reckless indifference in respect thereto, would render their employer liable for injuries resulting therefrom, notwithstanding there was negligence on the part of those injured, and no fault on the part of the servants after seeing the danger"

—is applicable to persons using the track or right of way of a railroad as a pathway of travel at points where the use of the track is with such frequency and by people in such large numbers, and for such length of time, as to impute to trainmen a knowledge of such use, and that there are persons in exposed positions on the track at the time of operating the train over such point. Ga. Pac. Ry. Co. v. Lee, 92 Ala. 271, 9 South. 230; Nave v. A. G. S. R. R. Co., 96 Ala. 264, 11 South. 391.

But appellants contend—conceding, for the sake of discussion, that the evidence shows or tends to show a customary use of the track at the place in question as an avenue of travel by the public, and for such length of time as to impute notice thereof to the defendant Jessie—that such use is not shown to coexist with the proximity of a city or town, and therefore the plaintiff's intestate is not brought within the protection of this rule. This contention is based upon what seems to be a dictum in the Stewart Case, where the court, in speaking of the admissibility of evidence showing the character of

use necessary to bring it within the rule of the Lee Case, said:

"But it is still the law that the mere fact of a customary public use, standing alone, is not admissible. Such use must be frequent and by a large number of people, and must coexist with the proximity of a populous city or village"—citing Savannah, etc., Ry. Co. v. Meadors, 95 Ala. 137, 10 South. 141.

In the Meadors Case, the court was dealing with a case of negligence in respect to an injury occurring within a town or city, and not a case charging wantonness occurring in a thickly populated neighborhood in the country; and the court, in dealing with the Stewart Case, manifestly did not take account of the express holding in Haley v. K. C., M. & B. R. R. Co., 113 Ala. 640, 21 South. 357, though the Haley Case' was cited with approval in the Stewart Case. In the Haley Case wantonness was charged, and, as the complaint averred, the injury occurred "at, to wit, a point about three miles northwest of Sulligent in said county"; and in responding to the contention that this count was insufficient to show wantonness by reason of the frequent use of the right of way by the public, and the reckless disregard of this condition by the trainmen in operating trains over the place of said injury, the court said:

"There is no reason why the doctrine does not apply as well to densely populated neighborhoods in the country, when the conditions exist such as are here averred, as to * * * towns and villages. It is the likelihood of peril to the safety of passers-by, known to defendant's employés, that makes the duty, and not the place itself."

In Whitehead v. St. L. & S. F. R. R. Co., 179 Ala. 314, 60 South. 930, decided on the same day as the Stewart Case, supra, it was said:

"This rule applies to populous crossings, or points in cities, towns, and villages where many people get upon the roadbed; and the rule has been extended in a few cases to densely populated neighborhoods in the country"—citing Haley v. K. C. M. & B. R. R. Co., 113 Ala. 640, 21 South. 357; H. A. & B. R. R. Co. v. Robbins, 124 Ala. 113, 27 South. 422, 82 Am. St. Rep. 153; and Southern Ry. Co. v. Stewart, supra.

The Haley Case was again referred to as a live authority in Thornton v. Southern Ry. Co., 199 Ala. 532, 75 South. 4. So it is manifest that it was not the purpose of the court by the opinion in the Stewart Case to overrule Haley's Case, and limit the application of this doctrine to populous districts in cities, towns, and villages, to the exclusion of populous neighborhoods. Therefore this contention of appellants cannot be sustained.

The evidence shows that no one saw the train strike the plaintiff's intestate, and it is not shown by positive evidence that he was struck by the locomotive operated by de-

fendant Jessie, or that he was walking along the track when run down by the train, if so run down, and killed. But the evidence offered by the plaintiff goes to show that the place of the accident was a thickly populated neighborhood, adjacent to the town of Vinemont, that a family resided on every 40-acre tract of land in the neighborhood, and that there were from 15 to 26 families living within a radius of a mile of the place where the body was found; that the railroad tracks along the place of the accident for a mile or more were used daily and constantly as an avenue of travel by people living in the neighborhood, going to and from Vinemont; that there was a well-defined path along the right of way and between the rails over which passenger train No. 2 passed on this occasion; and that it was used by the school children in the neighborhood in going to and from school at Vinemont; that school was usually dismissed at 4 o'clock in the afternoon—some of the children being dismissed earlier; that as many as from 20 to 27 children had been seen traveling along the track about the time train No. 2 passed this point on the occasion of the alleged injury; that on the day intestate's body was found on the track train No. 2 passed a freight train at this point going south on the west track—a circumstance that would tend to destroy or drown the noise of the approaching passenger train; the defendant Jessie, the engineer in charge of the locomotive pulling train No. 2, had been in the service of the railroad company, operating freight and passenger trains over this point, for 20 years, and had been running this passenger train going north, and other passenger trains, over this point from two weeks to a month; that he had run other passenger trains on this division between Decatur and Birmingham, passing over this point daily for a considerable length of time. He testified:

"During my experience as passenger engineer, operating over that track, I don't remember of seeing children at that place. I have seen children coming from school and going to school north of there, going along the old roadbed. One place is down considerable; I guess 75 feet; then it comes up. close and runs all the way along by the side of this track near this place, and down near there a mile. It is some 10 or 15 feet away from the track, a place of absolute safety from passing trains. I don't remember of ever seeing any children walking along between the rails of the north-bound track at that place at any time. I never noticed any beaten pathway along there for children, and could not say whether they came up there or not. I had never noticed anything like that. I could not see the center of my track at all on that curve. It is absolutely impossible to sit in the seat to run one of those engines on a curve and see ahead. No, you could not see the center of the track to save your life. You could see the nearest rails there along the ties on that track. There was nothing to prevent me from seeing the track

if the child had been hit on the other side of the curve."

After examining a diagram of the railroad track at this point the witness further testified:

"I could not see it at all; I hadn't the benefit of any straight track. That point A is still on the curve. There is something which prevents me from seeing it, and it is the boiler; the boiler is above my head. I can't see the opposite track at all on a curve. My fireman was down in the gangway. I went over this place knowing that I could not see, and that the fireman was down in the gangway, and not seeing. The fireman is subject to my orders. He has to do what I tell him to. A tall man like myself, by leaning straight out the window, he could almost see the center of the track. I have looked at that place since the accident occurred, and if I had been leaning out so far at the time, I could have seen whether or not my track was obstructed. I have a hard job running an engine. Some of our tracks are one curve right after another, you have got to look after the engine all the time. For instance, putting in oil here and there, touching up this, and tightening up this, or any little thing, or anything you have to do. It is not necessary at all times to do it on a curve, but you have to do these things on a curve sometimes. It took me about a minute, I guess, to get around this curve, going 35 miles per hour. It is a little less than a half a mile. I didn't find any signs. I was not looking for anything like that. I didn't see any signs of blood or anything. I don't know if the little boy's cap was found on the engine. I never heard it was found on the engine before. My engine was equipped with all modern appliances for blowing the whistle, ringing the bell, etc. The appliances for reducing the speed of the engine were in good working order in every way. It was a first-class engine."

Other witnesses were examined by defendants whose evidence tended to show that the witness Jessie could not see the center of the track in approaching and passing the place where the body of plaintiff's intestate was found.

It has been held that—

"Where the circumstances of a case are such that it may be reasonably concluded that a person was guilty of * * * a wanton act, the question must be submitted to the jury." Southern Ry. Co. v. Benefield, 172 Ala. 588, 55 South. 252, 35 L. R. A. (N. S.) 420; Anniston Electric & Gas Co. v. Elwell, 144 Ala. 317, 42 South. 45.

The evidence in this case clearly affords an inference that plaintiff's intestate, while walking along the track, or standing thereon, was run upon and killed by the train operated by defendant's servant Jessie, and that he was guilty of wantonness in approaching and passing this place without keeping a lookout or giving signals of the train's approach, and the affirmative charge was properly refused.

The contention of appellants that the affirmative charge requested by them in writing was erroneously refused, because the appellant railroad company was operating under federal control, is likewise without merit.

The federal statute authorizing federal control of carriers in time of war provides that—

"Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the federal government. Nor shall any such carrier be entitled to have transferred to a federal court any action heretofore or hereafter instituted by or against it, which action was not so transferable prior to the federal control of such carrier." 40 Stat. 456, § 10 (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, § 3115¾j).

This statute does not purport to create liability against such carrier, but merely to regulate in a measure proceedings against them in actions arising under existing laws. One effect of this statute is to deny to such carrier the right to defend such actions on the ground that it is operating as an agency of the federal government under federal control. U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, § 3115¾j; L. & N. R. R. Co. v. Johnson, 204 Ala. 150, 85 South. 372; Vaughn v. State, 17 Ala. App. 35, 81 South. 417; M. & O. R. R. Co. v. Jobe, 122 Miss. 696, 84 South. 910; Lavalle v. North. Pac. R. R. Co., 143 Minn. 74, 172 N. W. 918, 4 A. L. R. 1659, and note; Hines v. Henaghan (C. C. A.) 265 Fed. 836; Wheeler v. A. C. L. R. R. Co. (Ga. App.) 103 S. E. 178.

The result reached by the holding of the majority renders further discussion unnecessary, and for the reasons above stated I respectfully dissent.